**SOLAREX CORPORATION and RCA Corporation, Plaintiffs,**

**v.**

**ARCO SOLAR, INC., Defendant.**

**No. 87 Misc. 0223 (CPS).**

United States District Court, E.D. New York.

March 30, 1988.

Harold E. Wurst, Jai ho Rho, Nilsson, Robbins, Dalgarn, Berliner, Carson & Wursy, Los Angeles, Cal., for Arco Solar, Inc.

Richard A. Meserve, Bruce N. Kuhlik, Covington & Burling, Washington, D.C., for American Physical Soc.

MEMORANDUM AND ORDER

ALLYNE R. ROSS, U.S. Magistrate:

Arco Solar, Inc. ("Arco") is a defendant in a patent infringement action pending in the District of Delaware.  In this pre-trial discovery motion, Arco seeks to compel the American Physical Society (the "Society"), the publisher of a scholarly journal in the field of physics and a non-party to the underlying litigation, to disclose the identity of an independent scholar/referee who assisted the journal's editor by evaluating the suitability of a manuscript submitted for publication.  In this context, the Society invites—and Arco opposes—the creation

---

**3.** In view of this holding, the substantive merit  of plaintiffs' motion need not be reached.

under Rule 501 of the Federal Rules of Evidence of a new, qualified testimonial privilege protecting the identity of reviewers whose critical reviews of manuscripts contribute to the editorial processes of scholarly journals. Mindful of the weighty authority counseling restraint in recognizing and construing testimonial privileges, particularly where the interests at stake may be protected by less onerous means, I decline to endorse the proposed privilege in the context of this case. Nonetheless, the Federal Rules of Civil Procedure mandate a careful balancing of the competing interests where matter sought in pre-trial discovery implicates first amendment rights or other significant societal values. Because, under the special circumstances of this case, the interests in maintaining the confidentiality of the information sought far outweigh any need for that information demonstrated by Arco, I conclude that Arco's motion to compel must be denied.

## THE FACTUAL BACKGROUND

### A. The Delaware Patent Litigation

In the underlying lawsuit, brought in the United States District Court for the District of Delaware, plaintiff Solarex Corporation ("Solarex"), the licensee of three patents owned by RCA Corporation ("RCA") relating to solar cells, charges its competitor, defendant Arco Solar, Inc. ("Arco"), with willful infringement of those patents. *Solarex Corporation and RCA Corporation v. Arco Solar, Inc.* (D.Del. Civil Action No. 87–237 MMS). The basic patent, No. 4,064,521 (the "521 patent"), for "Semiconductor Device Having a Body of Amorphous Silicon", was applied for on July 28, 1975 and granted by the Patent and Trademark Office on December 20, 1977.

In its answer to the complaint, Arco denies infringing the subject patents and asserts a number of affirmative defenses. These include general allegations that the "patents are each invalid pursuant to 35 U.S.C. § 102 ... [and] 35 U.S.C. § 103"—barring the patenting of an invention previously described in a "printed publication" (§ 102) or obvious in light of the "prior art" (§ 103) (affirmative defenses 3

and 4). Arco also claims that the patents are invalid because they were "procured by inequitable conduct before the United States Patent and Trademark Office" (affirmative defense 6).

### B. The American Physical Society and Its Publications

Formed in 1899, the Society is a not-for-profit organization which seeks to promote the advancement and diffusion of knowledge of physics, in part through the publication of journals reporting the results of scientific research. Its membership of approximately 40,000 individuals is composed primarily of professional physicists practicing in universities, industry and national laboratories. Two of the journals published by the society are *Physical Review Letters* and *Physical Review*. The former is designed for rapid publication of short reports of important research in the field of physics and the latter publishes longer and more detailed reports of the results of such research.

The Society exercises quality control over the contents of its journals by reliance both on its editorial staff of professional physicists and on independent referees who are selected for their expertise in the particular subject area of the manuscript to be reviewed. As explained in the *Physical Review Letters'* July, 1987 statement of "Policy and Procedures", it is a customary editorial procedure of the journal to submit a manuscript to one or two independent peer reviewers because "the editors cannot be sufficiently competent in the special areas addressed by the submitted papers to decide on the disposition of the papers themselves." The referees, who are chosen by the editor "from a list of about 14,000 physicists selected from the international community", are asked "to comment critically on the validity and importance of the paper" and to express their opinion concerning "the degree of general interest" it holds for the journal's readers.

As represented in the affidavit of David Lazarus, the Editor-in-Chief of both *Physical Review Letters* and *Physical Review*, the referees selected by the Society under-

take this review with the understanding that, although their comments will be made available to the author of the manuscript, their identities will not be disclosed. In this regard, according to Lazarus, if a referee's comments are transmitted to an author, the Society takes care to excise all indications of the referee's identity. Aided by the referee's comments, the journal's editor then determines whether to publish the manuscript and, if so, what modifications might be required.

Reviewers solicited by the Society are also advised that they may seek the advice of colleagues in evaluating the manuscript, and may even pass the manuscript along to a "knowledgeable colleague" to furnish a review if they are unable to do so themselves. However, the discretion to consult others with respect to the manuscript is limited by the explicit admonition that "the paper has not yet been published and thus is privileged information." ("Physical Review Letters Manuscript Referral" form, appended to statement of "Policies and Procedures"). As explained in the Lazarus affidavit, "[t]he referees receive a manuscript with the understanding that ... [it] is not to be used for any purpose outside the peer-review-process."

### C. The Spear and Le Comber Manuscript

In May of 1975, W.E. Spear and P.G. Le Comber of the University of Dundee in Scotland submitted for publication to the *Physical Review Letters* a manuscript entitled "Substitutional Doping of Amorphous Silicon". In accordance with customary practice, the journal's editor transmitted the manuscript to two independent referees, both of whom provided the requested comments. One of the referees, Dr. Helmutt Fritzsche of the University of Chicago, who subsequently chose to disclose his identity to the authors, reviewed the article favorably and urged its immediate publication. The other recommended against publication, suggesting that the authors complete a further series of measurements and studies for possible publication as a more detailed paper. The journal's editor accepted the views of the more critical referee, concluding that "while a report of this work may deserve publication it is not of such novel and stimulating character as to warrant publication as a Letter." Consistent with the referee's suggestion, he recommended that the authors submit an expanded version of the manuscript for publication in the *Physical Review*. The editor's letter to the authors, dated June 12, 1975, enclosed the critique of the second reviewer, deleting all references to the referee's identity, but did not transmit the favorable review prepared by Dr. Fritzsche. Nor did the editor's letter disclose that a favorable review had been submitted. According to the Lazarus affidavit, it is not unusual for an editor to forward to the author only the comments of the more critical referee, as a guide to modification of the manuscript.

Spear and Le Comber did not resubmit their manuscript to either of the Society's journals. Rather, within five days of receiving the editor's letter, the authors submitted it for publication to a British journal entitled *Solid State Communications*. The article, noted "received 19 June 1975", was published by *Solid State Communications* on November 1, 1975.

On July 28, 1975, some six weeks after Spear and Le Comber submitted their manuscript to *Solid State Communications* but three months prior to its publication, the application for the RCA '521 patent at issue in this lawsuit was filed in the United States Patent and Trademark Office. In assessing that application, the patent examiner cited the Spear and Le Comber article as follows:

> Attention is directed to the article by Spear et al who teaches substitutional doping of amorphous silicon prepared by glow discharge. However, the article issued 1 November 1975 which is subsequent to parent application Serial No. 599,588 filed 28 July 775 [sic].

### D. The Instant Discovery Proceeding

As part of discovery in the Delaware patent litigation, Arco secured a subpoena from this court requiring the Society to

appear and testify concerning the mid–1975 submission of the Spear and Le Comber manuscript, and the identity of all referees who reviewed the paper. The subpoena also called for the production of all documents the Society possessed relating to the submission. The Society resisted the subpoena, referring to its "long-standing practice to hold information relating to the submission of manuscripts, including information relating to the identities and comments of referees, in the strictest confidence."

Thereafter, pursuant to Rule 6(b)(ii) of this court's Standing Orders on Discovery, counsel for Arco submitted a letter asking the court to compel the Society to appear for deposition and provide the requested information. In addressing the relevance of that information to the pending lawsuit, counsel noted that there had been "[a]llegations ... within the industry at issue in this litigation that publication of the 1975 Spear article was blocked by a referee having ties to RCA." However, counsel specifically disclaimed any intention on Arco's part to advance that allegation in the lawsuit "at this time" because, in counsel's words, Arco had "no factual basis" to support such a claim. Rather, according to Arco's counsel,

> The purpose of the intended discovery at issue here is to determine (1) the truth of such allegations and (2) why The American Physical Society claimed in its June 12, 1975 letter ... that there was only one referee when, in fact, there were at least two. In addition to the equities involved, legal issues of derivation of the invention and whether the paper is prior art are raised.

Following the Society's submission of a response to Arco's letter, both parties requested and were granted an opportunity to brief the issues more fully.

In its more recent submissions, the Society has conceded that since Arco already possesses both the comments of the critical referee and the identity and views of the favorable referee, there is no longer any need to protect the authors' interest in maintaining the confidentiality of these matters. Accordingly, the Society produced almost its entire file on the issue, reserving and redacting solely those references that would disclose the identity of the second referee. Thus, the only remaining issue on this motion concerns whether the Society should be required to disclose the identity of the second referee.

In resisting disclosure, the Society urges judicial recognition of a qualified evidentiary privilege protecting its referees' identities. In support of its request, the Society argues that maintaining the confidentiality of its referees' identities is central to the preservation of its peer review process. In this regard, the Society proffers the affidavits of physicists associated with the Society attesting to the need for referee anonymity in the peer review process and the importance of that process in maintaining the quality of scientific literature. As an alternative to its suggestion that a new privilege be recognized, the Society contends that, under the circumstances presented here, its peer review process, or at least the identity of its reviewer, is entitled to protection from discovery under Rule 26(c) of the Federal Rules of Civil Procedure.

Arco contests the propriety of embracing a novel evidentiary privilege in the circumstances of this case. Further, Arco maintains that any balancing of the burdens and hardships occasioned by granting or denying the disputed discovery under Rule 26(c), Fed.R.Civ.P., tips in its favor. Specifically, it is Arco's position that disclosure of the referee's identity is relevant and necessary to its defense of the patent litigation in two respects. First, Arco seeks to determine whether the anonymous referee so disseminated the Spear and Le Comber manuscript as to constitute prior "printed publication" or "prior art" within the meaning of 35 U.S.C. §§ 102 and 103. Second, as indicated in its initial letter on the subject, Arco still seeks to determine whether the anonymous referee gave access to the manuscript to the inventors of the RCA '521 patent, on the theory that such access, if undisclosed by the inventors, would constitute "inequitable conduct before the Patent and Trademark Office,"

rendering the patent unenforceable. Finally, Arco urges that any legitimate confidentiality interest the Society may have in maintaining the anonymity of its referee can be amply safeguarded by a carefully drawn protective order.

## DISCUSSION

### A. Qualified Privilege

■ As the Society apparently appreciates, while the information it seeks to shield from disclosure—involving the peer review of manuscripts being considered for publication in a scholarly journal—implicates interests similar to those previously granted limited protection, it does not fit neatly within any category of recognized qualified privilege. Thus, for example, the Society cites, for purposes of analogy, *Gray v. Board of Higher Education, City of New York*, 692 F.2d 901 (2d Cir.1982) (discussed below at 30–32), in which this Circuit arguably endorsed a form of qualified privilege for peer review in the context of the academic tenure decision-making process.[1] The process at issue here, however, *i.e.*, the editorial peer review of scholarly manuscripts outside of the university setting, does not involve at least one aspect of "academic freedom" underpinning the *Gray* court's decision: that is, the interest in preventing "government intrusion into the life of colleges and universities," *id.* at 907.

Similarly, the Society invokes authorities extending a qualified privilege to protect the process of "self-evaluation" or "self-critical analysis." *See, e.g., Bredice v. Doctors Hospital, Inc.*, 50 F.R.D. 249 (D.D.C. 1970), *aff'd mem.*, 479 F.2d 920 (D.C.Cir. 1973), and other cases discussed below at 174–75. Again, however, this line of cases is not directly apposite. It appears more directed to the fostering of an internal, institutional *self*-analysis than to the preservation of relationships among an independent reviewer, the author of a manuscipt and a journal contemplating its publication. While the Society contends that what is at stake here is not simply an independent evaluation of an author's manuscript, but rather "self-directed analysis" of the journal's contents and a more general "self-evaluation" within the scientific community, existing authorities invoking the "self-evaluative privilege" do not appear to construe its scope so expansively.

Because no recognized privilege directly governs the circumstances here, it is clear that the Society has proposed, if not the endorsement of a novel evidentiary privilege, at least a significant expansion of one or more existing ones. Hence, both parties have turned their attention to the provisions of Rule 501, Fed.R.Evid., empowering federal courts to fashion testimonial privileges, and to Professor Wigmore's four-part test, endorsed by the Second Circuit in *In Re Doe*, 711 F.2d 1187, 1193 (2d Cir. 1983), for determining whether novel privileges deserve judicial recognition. 8 J. Wigmore, *Evidence* § 2285 at 527 (McNaughton rev. 1961).[2] Not surprisingly, upon applying the Wigmore criteria to the record presented here, the parties reach divergent conclusions concerning the propriety of establishing the proposed privilege in the circumstances of this case.

In urging the adoption of this new or expanded privilege, the Society has adduced persuasive evidence, in the form of affidavits of established scholars associated with the Society, that the principle of "confidential peer review is a central ...

---

1. Other authorities adopting a qualified privilege in this area are discussed below at 173.

2. The four fundamental conditions Professor Wigmore considers necessary to the establishment of a privilege are as follows:
    (1) The communications must originate in a confidence that they will not be disclosed.
    (2) This elem.ent of confidentiality must be essential to the full and satisfactory maintenance of the relation between the parties.
    (3) The relation must be one which in the opinion of the community ought to be sedulously fostered.
    (4) The injury that would inure to the relation by the disclosure of the communications must be greater than the benefit thereby gained for the correct disposal of litigation.
    8 J. Wigmore, *Evidence* § 2285 at 527 (McNaughten rev. 1961).

quality-control feature" in the scientific enterprise, and that "preservation of the anonymity of referees is essential [not only] to the Society's operations," but also to the maintenance of "the quality of scientific literature in the United States." Affidavit of Dr. William H. Havens, Jr., Professor Emeritus, Department of Applied Physics and Nuclear Engineering, Columbia University, ¶¶ 5, 6 and 9. The Society has marshalled substantial and uncontroverted support for the argument that the interests it seeks to foster have social importance. This does not, however, necessarily counsel the establishment of a novel evidentiary privilege.

At the outset, and without purporting to embark upon a detailed examination of the Wigmore criteria in the circumstances of this case, it would appear that the privilege the Society proposes does not fit easily within the conceptual framework of a traditional evidentiary privilege as defined by Wigmore. The Wigmore model seems calculated to advance a societal interest in a close personal relationship, such as attorney-client or husband-wife, that would be fostered by protecting those who disclose information in the context of that relationship under an expectation of confidentiality. Here, however, we have neither a close personal relationship nor an individual who is benefited by the disclosure of personal information within the confines of such a relationship. Rather, the peer reviewer who assists in the journal's editorial process is not only independent of the journal but is selected for his independence from the author whose manuscript is being critiqued. Further, it is not the reviewer who benefits from the evaluation communicated to the journal and the author, but rather, as the Society urges, the journal and the scientific community at large.

Moreover, both Rule 501, Fed.R.Evid., and the Wigmore model are directed to an examination of "testimonial privileges" which, if recognized, would compel the exclusion at trial of protected material. By contrast, the Society's proposed privilege is apparently not testimonial in nature but rather a form of qualified immunity from discovery, aimed at barring or limiting pretrial disclosure of matters pertaining to the journal's peer review process.

Most significantly, because evidentiary privileges contravene the fundamental principle that "the public ... has a right to every man's evidence," *United States v. Bryan*, 339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950); 8 J. Wigmore, *Evidence* § 2192 at 70, exceptions to the obligation of every man to testify are neither "lightly created nor expansively construed, for they are in derogation of the search for the truth." *United States v. Nixon*, 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed. 2d 1039 (1974); *See also Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980); *In Re Dinnan*, 661 F.2d 426 (5th Cir.1981), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2904, 73 L.Ed.2d 1314 (1982). Thus, absent a "compelling justification for a new privilege," *In Re Dinnan*, 661 F.2d at 430, weighty judicial authority counsels against the creation of a rule that will presumptively impinge upon the truth finding process.[3]

Here, moreover, there is not even a need to overcome these venerable principles cautioning judicial restraint in the creation or expansion of privileges, nor is it necessary to examine whether the Society's proposed privilege meets the demanding criteria of the Wigmore test. As indicated below, the Federal Rules of Civil Procedure provide a

---

**3.** In recent years, the Supreme Court has demonstrated both a willingness to narrow the scope of existing privileges and a marked reluctance to endorse new ones. *See, e.g., United States v. Arthur Young & Co.*, 465 U.S. 805, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984); *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906; *United States v. Gillock*, 445 U.S. 360, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980); *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979); *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090; *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). The Second Circuit has shown similar restraint. *See In Re Grand Jury Subpoena Dated January 4, 1984*, 750 F.2d 223 (2d Cir.1984); *In Re Grand Jury Subpoena (Marc Rich)*, 731 F.2d 1032 (2d Cir.1984); *In Re Grand Jury Subpoena (Matthews)*, 714 F.2d 223 (2d Cir.1983); *In Re Doe*, 711 F.2d 1187; *In Re Cueto*, 554 F.2d 14 (2d Cir.1977); *Kaufman v. Edelstein*, 539 F.2d 811 (2d Cir.1976).

framework for balancing, in the pre-trial discovery context, a litigant's need for disclosure against a societal interest in confidentiality asserted by one opposing such disclosure. Within this framework, the instant dispute may be resolved.

### B. Rule 26(c), Fed.R.Civ.P.

Rule 26(c) of the Federal Rules of Civil Procedure empowers the district court to "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden of expense, including ... that discovery not be had...." Under the Rule, a court is required to compare the potential hardship to the party against whom discovery is sought, if discovery is granted, with that to the party seeking discovery if it is denied. *Heat and Control, Inc. v. Hester Industries, Inc.*, 785 F.2d 1017, 1023 (Fed.Cir.1986); *Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 559 (7th Cir.1984); *Marrese v. American Academy of Orthopaedic Surgeons*, 726 F.2d 1150, 1159 (7th Cir.1984) (*en banc*). As stated by the District of Columbia Court of Appeals in the recent case of *Plough Inc. v. National Academy of Sciences*, 530 A.2d 1152, 1155–56 (D.C.App.1987), the principles governing the application of the Rule are well-established:

The person resisting discovery on the basis of confidentiality must first demonstrate that disclosure might be harmful.... The burden then shifts to the party seeking discovery to establish that the disclosure is both relevant and necessary to the action....

If both parties have met their respective burdens, the trial court must balance the need for the information against the injury that would result from disclosure.... [citations omitted].

In balancing conflicting interests, courts are admonished not only to consider the nature and magnitude of the competing hardships, but also to "give more weight to interests that have a distinctively social value than to purely private interests." *Marrese v. American Academy of Orthopaedic Surgeons*, 726 F.2d at 1159. Thus,

federal courts applying the test mandated by Rule 26(c) "have frequently denied or limited discovery absent claims of formal privilege, based upon reasons of public policy." *Plough Inc. v. National Academy of Sciences*, 530 A.2d at 1157, *citing* 4 J. Moore, J. Lucas & G. Grotheer, *Moore's Federal Practice* ¶ 26.60[3] (2d ed. 1986).

Such a balancing approach, which takes into account a broader view of the societal interests at stake, is well-recognized in this Circuit. As expressed in *Gray v. Board of Higher Education*, 692 F.2d at 903:

Any finding that information is protected from discovery must reflect a balancing between on the one hand, the parties' right to discovery, which stems from society's interest in a full and fair adjudication of the issues involved in the litigation and, on the other hand, the existence of a societal interest in protecting the confidentiality of certain disclosures made within the context of certain relationships of acknowledged social value.

The balancing process articulated in *Gray* has been applied by a host of other federal courts in ruling on discovery requests implicating important social values. *See, e.g., Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545 (11th Cir.1985); *Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556; *Marrese v. American Academy of Orthopaedic Surgeons*, 726 F.2d 1150; *Baker v. F & F Investment*, 470 F.2d 778 (2d Cir. 1972), *cert. denied*, 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973); *Ross v. Bolton*, 106 F.R.D. 22 (S.D.N.Y.1985); *Lora v. Board of Education*, 74 F.R.D. 565 (E.D. N.Y.1977); *Richards of Rockford, Inc. v. Pacific Gas & Electric Company*, 71 F.R. D. 388 (N.D.Cal.1976); *Apicella v. McNeil Laboratories, Inc.*, 66 F.R.D. 78 (E.D.N.Y. 1975). *Accord, Plough, Inc. v. National Academy of Sciences*, 530 A.2d 1152.

The Supreme Court, too, has emphasized that trial courts are obligated to accommodate such competing interests. In *Herbert v. Lando*, 441 U.S. 153, 157, 99 S.Ct. 1635, 1639, 60 L.Ed.2d 115 (1979), the Supreme Court rejected a constitutionally-based privilege barring a defamation plaintiff from

inquiry into the "editorial process" of a publisher of allegedly defamatory material. In so doing, however, the Court urged trial courts not to neglect their power under Rule 26(c) to restrict discovery where "justice requires [protection for] a party or person from annoyance, embarrassment, oppression, or undue burden or expense...." *Id.* It also admonished them to apply "firmly" the relevancy requirement of Rule 26(b)(1), Fed.R.Civ.P. *Id.* Thus, even in the absence of any recognized privilege, the Supreme Court has approved the imposition of a higher standard of relevancy to provide relief from discovery where the hardships identified in Rule 26(c) are present. *Id.* at 177, 99 S.Ct. at 1649.

In his concurring opinion in *Herbert,* Justice Powell emphasized that, notwithstanding the unavailability of any formal privilege, the relevancy standard of Rule 26(b)(1) should be strictly construed where discovery implicates important societal values—especially those protected by the first amendment. Specifically, he wrote:

> Under present Rules the initial inquiry in enforcement of any discovery request is one of relevance. Whatever standard may be appropriate in other types of cases, when a discovery demand arguably impinges on First Amendment rights a district court should measure the degree of relevance required in light of both the private needs of the parties and the public concerns implicated.

> \*     \*     \*     \*     \*     \*

The Court today emphasizes that the focus must be on relevance, that the injunction of Fed.Rule Civ.Proc. 1 must be heeded, and that "district courts should not neglect their power to restrict discovery" in the interest of justice or to protect the parties from undue burden or expense. *Ante,* at 177 [99 S.Ct. at 1649]; see Fed.Rule Civ.Proc. 26(c). I join the Court's opinion on my understanding that in heeding these admonitions, the district court must ensure that the values protected by the First Amendment, though entitled to no constitutional privi-

lege in a case of this kind, are weighed carefully in striking a proper balance. *Id.* at 179–80, 99 S.Ct. at 1650–51.

With these established principles as guidance, the competing interests in the instant case may be identified, analyzed and, in the words of Justice Powell, "weighed carefully in striking a proper balance."

## C. The Society's Need for Confidentiality

### 1. The Society's Evidentiary Showing

■ As indicated above, as evidentiary support for its requested protection of its peer review process, the Society has submitted affidavits of its Editor–In–Chief, Dr. David Lazarus, a Professor Emeritus of the Department of Physics of the University of Illinois at Urbana–Champaign, and its Executive Secretary, Dr. William W. Havens, Jr., Professor Emeritus of Applied Physics and Nuclear Engineering at Columbia University. In general, the affidavits attest both to the importance of "peer review" contributions to the editorial processes of scientific journals like those published by the Society, and to the need for confidentiality in order to preserve the availability of such contributions in the future.

More specifically, the affidavits explain that the Society regularly subjects manuscripts submitted for publication to "peer review" by independent referees selected for their expertise in the relevant subject area. This is necessary because the journals' editors may not themselves possess sufficient expertise to evaluate critically the merits of scientific manuscripts in the diverse and complex areas covered by the Society's publications. Once prepared, the reviewers' critiques are heavily relied upon by the journal's editors in assessing the accuracy and completeness of the manuscript, in evaluating its suitability for publication and in recommending improvements to the authors. As such, referees' comments are considered "of central importance" to the editorial process of the Society's scholarly journals.

According to Dr. Havens, this "confidential peer review" is not unique to the Society. Rather it is a "central and common quality-control feature" in science generally, and is regularly applied "in determining the suitability of a manuscript for publication by scientific journals." This is so, Dr. Havens explains, because

> [s]cience is a cumulative enterprise in which each scientist builds on the work of others. Because of the enormous expense that would be associated with reproducing the results of others, a scientist must rely to a significant extent on the validity of reported results.

Hence, the peer review function performed by independent referees for editors of scholarly journals contributes to the advancement of science by helping to assure that "faulty, incomplete or misleading results are not published."

Finally, the Society's affidavits provide support for its position that protecting the anonymity of its reviewers is essential to the maintenance of the peer review process. In this regard, Dr. Lazarus attests that "[i]n order to assure complete and candid advice from referees, it is essential that the identity of the referees be held confidential." Similarly, Dr. Havens states:

> The policy of non-disclosure serves to assure that referees can and will provide full and candid reviews of manuscripts. A referee may often be a scientific colleague of the author, and the disclosure of a referee's identity could threaten to disrupt working relationships and inhibit rigorous scrutiny of manuscripts.
>
> \* \* \* \* \* \*
>
> If the confidentiality of the peer-review process is breached, all referees must provide their advice to the Society in the expectation that disclosure might occur.

Hence, Dr. Havens attests, in the "tens of thousands of referee-reviewed papers [the Society has published] over the years," it "has *never* intentionally disclosed the identity of a referee."

In the face of this evidentiary showing, Arco makes no affirmative counter-showing. Rather, it points to Dr. Fritzsche's voluntary disclosure to Spear and Le Comber that he had reviewed their manuscript for the Society, and to the asserted frequency with which scientists and scholars choose to circulate their work for critical evaluation by colleagues. According to Arco, both of these facts support its argument that confidentiality is not essential to the maintenance of the Society's peer review process.

I do not agree. The willingness of a favorable reviewer to communicate his views to an author, like an author's voluntary circulation of a manuscript to solicit criticism from peers, are not germane to the question of whether involuntary disclosure of the identity of a critical reviewer could inhibit reviewers from offering frank criticism in the future. Further, Arco is incorrect in its claim that the Society has adduced no evidence that disclosure of reviewers' identities would impair the efficacy of its peer review process. That is the import of the representations made by Drs. Havens and Lazarus in their affidavits. It is Arco that has adduced no facts to dispute the Society's showing that confidentiality of reviewers' identities is necessary to preserve the integrity of its peer review process.

### 2. The Policy Considerations Implicated

By its evidentiary showing, the Society has identified a number of social values that will be implicated if the confidentiality of its peer review process is breached. That those values are of sufficient prominence to warrant special consideration in "striking a proper balance" under Rule 26, Fed.R.Civ.P., is recognized in law. In fact, three distinct lines of authority affirm the significance of social interests bearing a marked resemblance to those the Society seeks to foster—namely, cases extending some measure of first amendment protection to the "editorial processes" of journalists; cases recognizing a special social value in the academic "peer review process"; and cases attributing to the "deliberative" or "self-evaluative" process a heightened social significance. While the confidentiality interests asserted by the Society in this

case concededly do not fall squarely within any one of the qualified privileges recognized in these cases, they are nonetheless closely analogous, if not identical, to the underlying interests to which these authorities have accorded protection.

### a. *The Editorial Process*

As noted above, the Supreme Court's 1976 decision in *Herbert v. Lando* rejected a first amendment "editorial privilege" in a case where a defamation plaintiff was seeking disclosure from a defendant publisher bearing on the issue of malice. In the decade since *Herbert*, however, courts have distinguished that context from circumstances in which litigants have sought from *non*-party journals or journalists discovery which intrudes upon the editorial process. In the latter context, numerous authorities have recognized that discovery directed toward an examination of editorial activities is a substantial intrusion on editorial privacy, seriously implicating first amendment rights whether or not the identity of sources is sought. *See, e.g., U.S. Ex Rel. Vuitton Et Fils S.A. v. Karen Bags, Inc.,* 600 F.Supp. 667, 669 (S.D.N.Y.1985) (referring to a first amendment "editorial freedom to select what gathered information will be published and what will not ..."); *Westmoreland v. CBS, Inc.,* 97 F.R. D. 703, 706 (S.D.N.Y.1983) (affirming that "the importance of protecting a free press from intrusion and inquisition into the editorial process [is] [w]ithout doubt ... a substantial and important interest, not lightly to be overridden in litigation," *citing, inter alia, Herbert v. Lando,* 441 U.S. at 178, 99 S.Ct. at 1650. (Powell, J., concurring)); *Tavoulareas v. Piro,* 93 F.R.D. 35, 41 (D.D.C.1981) ("agree[ing] ... that the first amendment extends a degree of protection to journalists subject to discovery demands that impinge upon editorial and news gathering activities."); *Solargen Electric Motor Car Corp. v. American Motors Corp.,* 506 F.Supp. 546, 549, 553 (N.D.N.Y.1981) (same); *Application of Consumers Union of United States, Inc.,* 495 F.Supp. 582, 586 (S.D.N.Y.1980) (finding that subpoena seeking to examine "the reportorial and editorial processes ... would represent a substantial intrusion on ... significant aspects of a free press, [thus] ... implicat[ing] significant First Amendment interests notwithstanding that defendants do not seek discovery of previously undisclosed sources"); *Rosario v. New York Times Co.,* 84 F.R.D. 626, 631 (S.D.N.Y.1979) (recognizing "an editorial privilege" involving "what [a journal] gathers or what it publishes,").[4]

Where discovery sought from a third party journal or journalist impinges upon editorial activities, a court is required to evaluate and balance the competing legitimate interests. As explained by the court in *Tavoulareas v. Piro,* 93 F.R.D. at 41:

> In balancing a litigant's right to compel discovery against a newsman's assertion that discovery will intrude upon protected first amendment rights [specifically, editorial and news gathering activities], a court must not only weigh the litigant's need for discovery ... but also must carefully consider the seriousness of the intrusion on the editorial and news gathering processes .... Obviously, the more fundamental the impact upon the first amendment rights of the press, the greater the need for discovery must be before a court will order an intrusion.

(citations omitted). *See also Application of Consumers Union,* 495 F.Supp. at 586 (balancing need for discovery against intrusion upon editorial processes by analysis of four factors: "the nature of the suit in which discovery is being sought ..., the extent to which the information goes to the 'heart of the claims' of the party seeking disclosure ..., whether the party seeking

---

**4.** *See also Securities and Exchange Commission v. McGoff,* 647 F.2d 185 (D.C.Cir.), *cert. denied,* 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 974 (1981) (granting protection against compelled disclosure of "editorial policy or news gathering" during an investigation of a newsman); *Continental Cablevision, Inc. v. Storer Broadcasting Co.,* 583 F.Supp. 427 (E.D.Mo., E.D.1984) (journalist's privilege extends beyond confidential sources); *Maughan v. NL Industries,* 524 F.Supp. 93, 95 (D.D.C. 1981) ("The right of a newspaper to determine for itself what it is to publish and how it is to fulfill its mandate of dissemination must be given great respect ..."); *Loadholtz v. Fields,* 389 F.Supp. 1299 (M.D. Fla. 1975).

discovery has exhausted other sources for the information in question ..., and the impact of the discovery on First Amendment interests ... [citations omitted].").

In the instant case, the Society is seeking to protect the identity of its peer reviewers whose central function is to contribute to the editorial activities of its published journals, *Physical Review Letters* and *Physical Review*. By its affidavits, the Society has established that the contributions made by these peer reviewers are in fact essential to the editorial processes of its journals. The reviewers assess for the editors the worthiness of manuscripts for publication, and their conclusions in this regard are heavily relied upon in the decision whether and what to publish. They also recommend editorial modifications of manuscripts. That the Society's publications are scholarly journals rather than publications of the organized news media does not render them any less entitled to first amendment protection. *See Apicella v. McNeal Laboratories, Inc.*, 66 F.R.D. at 84–85 (applying to "technical publications", in that case, the *Medical Letter*, the same constitutional free press considerations the court found to exist for members of the organized media).

Concededly, it is the Society's policy, adhered to in this case, to communicate the editorial opinions and conclusions of independent reviewers to the author of the manuscript being considered for publication. To this extent, the editorial evaluations of the reviewers are not themselves considered confidential. Nonetheless, the Society's efforts to maintain the confidentiality of its reviewers' identities clearly serve a legitimate function in helping to preserve the integrity of its editorial process. The underlying interest the Society seeks to promote is thus of recognized first amendment significance.

### b. The Peer Review Process

As indicated earlier, a number of courts have permitted academic institutions to withhold disclosure of names and identities of peer-reviewers who contribute to the tenure decision-making process. *See, e.g., E.E.O.C. v. University of Notre Dame Du Lac*, 715 F.2d 331, 337 (7th Cir.1983) (recognizing "a qualified academic freedom privilege" in this context); *Gray v. Board of Higher Education*, 692 F.2d at 908 (adopting a balancing approach shielding tenure votes from "routine discovery" in discrimination suit when plaintiff has not been provided with a detailed statement of reasons for the denial of reappointment); *Keyes v. Lenoir Rhyne College*, 552 F.2d 579, 581 (4th Cir.), *cert. denied*, 434 U.S. 904, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977) (protecting faculty evaluation records after weighing the interest of the college in confidentiality against the need of the plaintiff for the material); *Jackson v. Harvard University*, 111 F.R.D. 472, 474 (D.Mass. 1986) (recognizing a qualified privilege); *Zautinsky v. University of California*, 96 F.R.D. 622 (N.D.Cal.1983), *aff'd*, 782 F.2d 1055 (9th Cir.1985) (same). *But see E.E. O.C. v. Franklin & Marshall College*, 775 F.2d 110 (3d Cir.1985), *cert. denied*, 476 U.S. 1163, 106 S.Ct. 2288, 90 L.Ed.2d 729 (1986); *In re Dinnan*, 661 F.2d 426.

Although it is unclear from the opinion in *Gray v. Board of Higher Education*, 692 F.2d 901, whether the Second Circuit has elevated peer review in the academic tenure context to the status of a qualified privilege, the court clearly showed special concern for the societal values at stake and acknowledged the need for confidentiality to preserve the integrity of the peer review process. In this regard, the court explicity concurred in the defendants' arguments that

> if the courts allow this protected sphere to be invaded, candid peer evaluation will be chilled, the harmony of faculty relations will be disturbed, and academic freedom will be threatened by government intrusion into the life of colleges and universities.

*Id.* at 907. Hence, the court employed a balancing test requiring plaintiff to meet a higher standard of relevance under the discovery rules to overcome the societal interest in preserving the confidentiality of the peer review process. Specifically, finding that "routine discovery of tenure votes could chill frank discussion and engender

disharmony among faculty," *id.* at 908, the court ruled that a plaintiff's need for the evidence would justify disclosure only if a "detailed statement" of reasons for the denial of tenure had not been provided.

As Arco has argued, and it may be correct, the third "concern" articulated by the *Gray* court as the basis for its decision—protection of academic freedom in the university context—is not present in this case. *But see Dow Chemical Co. v. Allen*, 672 F.2d 1262, 1275 (7th Cir.1982) ("We think it clear that whatever constitutional protection is afforded by the First Amendment extends as readily to the scholar in the laboratory as to the teacher in the classroom"). Nonetheless, both the Second Circuit's opinion in *Gray* and other authorities cited above provide support for the Society's position that disclosure of the identity of peer reviewers will undermine the effectiveness of its peer review process. Given the pressures operating against open criticism of a colleague, loss of confidentiality means that "candid peer evaluation will be chilled." *Gray v. Board of Higher Education*, 692 F.2d at 907. Similarly, loss of confidentiality "would probably unfavorably affect the ability of ... [the Society] to obtain the services of ... [independent scholar/reviewers] in the future." *Apicella v. McNeal Laboratories, Inc.*, 66 F.R.D. at 85.

As what it claims is contrary authority, Arco invokes the Supreme Court's opinion in *Herbert v. Lando*, 441 U.S. 153, 174, 99 S.Ct. 1635, 1647. There, the Court rejected the argument that if defamation plaintiffs were permitted discovery of defendants' editorial processes, "error-avoiding procedures [would] be terminated or stifled simply because there is liability for culpable error...." Arco's reliance on this language to refute the above authorities is misplaced. In *Herbert*, defendants' exposure to civil liability provided an incentive for continued rigorous scrutiny to assure the accuracy of their product. No similar incentive to avoid liability is present in the university tenure context; nor is it present here. Hence, the teachings of *Herbert* do not contradict those cases finding confiden-tiality necessary to preserve the integrity of the peer review process.

### c. *"Self-Critical Analysis"*

A final line of cases, closely akin to authorities protecting peer review in the academic tenure context, has "extended a 'qualified privilege' to protect the deliberations of internal institutional bodies ... whose function is to review and criticize the quality of the institution's work." *Plough Inc. v. National Academy of Sciences*, 530 A.2d at 1158. This privilege has been recognized in three distinct contexts: internal reports of hospital personnel evaluating the quality of patient care, *see, e.g., Gillman v. United States*, 53 F.R.D. 316 (S.D.N.Y. 1971); *Bredice v. Doctor's Hospital, Inc.*, 50 F.R.D. 249; affirmative action compliance reports setting forth an employer's affirmative action policies, *see, e.g., Penk v. Oregon State Board of Higher Education*, 99 F.R.D. 506, 507 (D.Or. 1982); *Banks v. Lockheed–Georgia Co.*, 53 F.R.D. 283, 285 (N.D.Ga.1971); and the results of certain internal corporate investigations, *see, e.g., FTC v. TRW, Inc.*, 628 F.2d 207, 210–11 (D.C.Cir 1980); *LTV Securities Litigation*, 89 F.R.D. 595, 614–18 (N.D.Tex.1981). Arco correctly notes that this "qualified privilege" limiting pre-trial discovery of self-evaluative deliberations has not been recognized in circumstances precisely analogous to those presented here. *See* discussion above at 167. However, as the District of Columbia Court of Appeals recently observed with respect to these authorities in *Plough, Inc. v. National Academy of Sciences*, 530 A.2d at 1158, in assessing the Academy's need for confidentiality concerning the deliberations of an internal review panel which critiqued a report issued by another of the Academy's committees:

> The concern expressed in these cases for unimpeded criticism and self-analysis supports confidentiality of the deliberations of the [Academy] review panels. The review process is a critical element in the publication of an Academy report, guaranteeing that each report is technically sound, and that it creditably represents the institutions. Reviewers provide their comments with the under-

standing that they will remain internal to the [Academy], and that their names will not be disclosed to the authoring Committee. Criticism would be less than frank if subject to disclosure outside the institution, even limited to disclosure under a protective order.

The identical policy consideration described by the *Plough* Court—the promotion of "unimpeded criticism" with a view toward improving the quality of a scholarly product—underlies the Society's request for confidentiality here.

### D. The Relevance and Necessity of the Reviewer's Identity to Arco's Defenses

To overcome the Society's showing of harm flowing from the disclosure of its referee's identity, Arco seeks to establish that the discovery sought is both relevant and necessary to its case. As noted, Arco's two theories of relevance relate to defenses it has interposed in the lawsuit—first, its allegation that the Solarex patents are unenforceable under 35 U.S.C. §§ 102 and 103, barring the patenting of an invention described in a prior "printed publication" or anticipated by the "prior art"; and second, its claim of invalidity of the patents arising from its defense of "inequitable conduct" before the Patent Office.[5]

#### 1. Arco's Defenses of "Printed Publication" and "Prior Art"

The thrust of Arco's first theory of relevance is that the requested disclosure might lead to evidence that the anonymous referee's circulation of the Spear and Le Comber manuscript constituted "printed publication" of the same invention embodied in the Solarex '521 patent, occurring prior to the application for the '521 patent on July 28, 1975. Arco is correct that such evidence, were it forthcoming, could bar patentability of the '521 patent under 35 U.S.C. § 102(a) and could similarly support a defense of "obviousness" in light of the "prior art" under 35 U.S.C. § 103. But

there is virtually nothing in the record to suggest that disclosure of the referee's identity would enable Arco to adduce this evidence.

The prior "printed publication" bar of 35 U.S.C. § 102(a) provides:

> A person shall be entitled to a patent unless—
>
> (a) the invention was ... described in a printed publication in this or a foreign country, before the invention thereof by the applicant for the patent ...

If the date of invention is not otherwise established, as is apparently the case with the Solarex '521 patent, it is deemed to be the date of filing of the patent application with the United States Patent and Trademark Office. *See Karr v. Botkins Grain & Feed Co.*, 329 F.Supp. 411, 413 (S.D. Ohio, E.D. 1970) (and cases cited therein).

The prior "printed publication" bar "is grounded on the principle that once an invention is in the public domain, it is no longer patentable by anyone." *In re Hall*, 781 F.2d 897, 898 (Fed.Cir.1986). As elaborated by the Court of Customs and Patent Appeals in *Application of Bayer*, 568 F.2d 1357, 1359–60 (C.C.P.A.1978), the bar emerges

> from the theory that the patent grant is in the nature of a contract between the inventor and the public. Hence, if knowledge of the invention is already accessible to the public there is a failure of consideration and no patent may be granted. *In Re Tenny*, 254 F.2d 619, 45 CCPA 894, 117 USPQ 348 (1958).

(footnote omitted).

In light of the genesis and intent of the bar—to disallow the patenting of an invention that is already "in the public domain"—it is unsurprising that "the touchstone is accessibility." *Id.* at 1359. More specifically,

> [t]he proponent of the publication bar must show that prior to the critical date the reference was sufficiently accessible,

**5.** With respect to both defenses, Arco must establish that the Spear and Le Comber manuscript and the '521 patent concern the same or similar subject matters. While the Society contests this, because the patent examiner cited the article in assessing patentability, I will assume, without deciding, that the requisite showing of materiality has been made.

**176**

at least to the public interested in the art, so that such a one by examining the reference could make the claimed invention without further research or experimentation.

*In Re Hall,* 781 F.2d at 899 (citations omitted). Otherwise put, a "printed publication" under § 102 "must have been actually published in such a manner that anyone who chooses may avail himself of the information it contains." 1 W. Robinson, *The Law of Patents* § 327 at 488 (1890), ("Robinson"), *quoted in Application of Bayer,* 568 F.2d at 1360.

Although the courts have made clear that the application of the bar is to be determined on a "case-by-case basis", *see, e.g., In Re Hall,* 781 F.2d at 899, certain guidelines have emerged in assessing "public accessibility." The standard may be met by distribution to a number of members of the interested public without any restriction on use. *See, e.g., Massachusetts Institute of Technology v. Ab Fortia,* 774 F.2d 1104 (Fed.Cir.1985) (paper delivered at conference attended by between 50 and 500 persons interested and skilled in the art, copies of which were distributed without restriction to at least six persons, constituted a "printed publication" under § 102). Placing the material in a location where it is readily accessible to the interested public—whether or not it is disseminated further—is also a "publication" under the statute. *See, e.g., In Re Hall,* 781 F.2d 897 (doctoral thesis catalogued in a university library, easily accessible to the interested public, found to be a "printed publication"); *In Re Wyer,* 655 F.2d 221 (C.C.P.A. 1981) (Australian patent application on file and open to public inspection at five sub-offices of the Australian patent office constituted a "printed publication" within the meaning of § 102).

Limited distribution, however, even to those skilled in the art, does not amount to "publication" under the statute unless the material is otherwise so situated that "any one who chooses may avail himself of the information it contains." Robinson at 488. Thus, in *Application of Bayer,* 568 F.2d at 1362, the United States Court of Customs and Patent Appeals held that the distribution of appellant's doctoral thesis to three members of a graduate committee, concededly members of the "interested public", for purposes of assessing appellant's entitlement to a degree, accompanied by depositing the manuscript in a university library where it remained uncataloged and unshelved, did not, as a matter of law, "transmute[ ] ... [the thesis] into a patent-defeating publication."

Here, the Society has established that the anonymous referee who critiqued the Spear and Le Comber manuscript was the referee whom the Society originally solicited. Hence, this is not a case in which the initial referee chose not to prepare the critique and thus passed it along to a colleague. Further, even if the referee consulted a few colleagues about the merits of the manuscript (as the procedures of the Society permit), this would not, as a matter of law, suffice to constitute a "printed publication" under 35 U.S.C. § 102(a). *Application of Bayer,* 568 F.2d 1357. Indeed, short of speculation that the referee widely circulated the manuscript to the interested public without any restriction on its use or deposited it in a library which catalogued and shelved it, the discovery sought could not benefit Arco in defending this lawsuit.

The possibility that the anonymous referee took any action which placed the manuscript in the public domain is rendered even more remote by the referee's acceptance of the manuscript under stated conditions of confidentiality. The Society's referral letter accompanying the manuscript expressly admonished that "the paper has not yet been published and is thus privileged information." This warning made explicit the general understanding of the Society's referees that the manuscripts they review are "not to be used for any purpose outside of the peer-review process" (Lazarus Declaration, ¶ 5). There is no indication in the record that this policy was not followed in this case.

The authorities confirm that when a document is disseminated under confidential conditions, the possibility that it will be considered as a "printed publication" is sig-

nificantly diminished, if not eliminated. *See, e.g., Moleculon Research Corp. v. CBS, Inc.,* 594 F.Supp. 1420, 1427 (D.Del. 1984), *aff'd in part, vacated in part on other grounds,* 793 F.2d 1261 (Fed.Cir. 1986), *cert. denied,* 479 U.S. 1030, 107 S.Ct. 875, 93 L.Ed.2d 829 (1987) (inventor's disclosure to "a few close colleagues" under circumstances indicating "a legitimate expectation of privacy and of confidentiality," even absent any explicit pledge of confidentiality, did not place invention in the public domain). *See also Stamicarbon, N.V. v. Escambia Chemical Corp.,* 300 F.Supp. 1209, 1215 (N.D.Fla.1969), *modified on other grounds,* 430 F.2d 920 (5th Cir.), *cert. denied,* 400 U.S. 944, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970). In short, under the circumstances here and in light of the controlling caselaw, it is only by indulging in unsupported speculation that Arco can hope, by this discovery, to secure information material to its defenses under 35 U.S.C. §§ 102 and 103.[6]

### 2. Arco's "Inequitable Conduct" Defense

Arco also maintains that the discovery it seeks is relevant and necessary to its sixth affirmative defense—that the Solarex patents are invalid because they were "procured by inequitable conduct before the United States Patent and Trademark Office." This defense arises from the "duty of candor" imposed on patent applicants to disclose to the Patent Office all material information of which they are aware. A violation of this duty "constitutes inequitable conduct resulting in unenforceability of a patent." *A.B. Dick Co. v. Burroughs Corp.,* 798 F.2d 1392, 1396 (Fed.Cir. 1986). *See also* 4 *Lipscomb's Walker on Patents* § 12:4 (3d ed. 1986).

The dual components of the "inequitable conduct" defense are materiality and intent to deceive. The former is satisfied by proof that "there is a substantial likelihood that a reasonable examiner would have considered the omitted reference or false information important in deciding whether to allow the application to issue as a patent." *J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.,* 747 F.2d 1553, 1559 (Fed.Cir. 1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). The component of the defense relating to intent is met by a showing that the person, "when judged as a reasonable person in his position, should have known of the materiality of a withheld reference." *Id.* at 1560. Once materiality and intent are established, "the court must balance them and determine as a matter of law whether the scales tilt to a conclusion that inequitable conduct occurred." *Id.*

In the instant case, Arco has advanced only one rationale in support of its claim that disclosure of the identity of the anonymous reviewer of the Spear and Le Comber manuscript is relevant and necessary to its "inequitable conduct" defense. It urges that the requested discovery may unearth evidence that "the anonymous referee or some other person who had access to the manuscript [presumably, via the referee] may have been associated with the inventor of the '521 patent", and presumably, made the existence and contents of the manuscript known to the inventor. Proof that the inventor knew of the manuscript and yet failed to disclose it to the patent examiner would thus assist Arco in establishing this defense to the infringement claims.

The flaw in the stated rationale is that Arco has already conceded that any link between the anonymous referee and the inventor of the '521 patent is wholly speculative. Indeed, so lacking is Arco in any factual basis to support the hypothetical link that it has disclaimed any intention of alleging a defense on this theory "at this time". Rather, Arco has acknowledged

---

**6.** To establish a defense under § 103, a defendant must show that the subject matter of the patent would be obvious in light of the "prior art" to a person having ordinary skill in the art. *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). In the context of this case, because the "prior art" at issue is the Spear and Le Comber manuscript, Arco's burden in meeting this defense is identical to its burden in making out a § 102 defense—that is, it must establish that the manuscript was in the public domain when the '521 patent application was filed.

that its purpose in deposing the referee is to determine whether there exists a factual basis to support such a defense.

Allegations of "inequitable conduct" before the Patent Office, like other allegations of fraud, are subject to the particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure. *Northern Engineering & Plastics Corp. v. Blackhawk Moulding Company, Inc.*, 205 U.S.P.Q. 609 (N.D.Ill., E.D.1979). *See also, Papst Motoren GMbH & Co. v. Kanematsu–Goshu (U.S.A.) Inc.*, 629 F.Supp. 864 (S.D.N. Y. 1986); *G & H Technology, Inc. v. United States*, 8 Cl.Ct. 572, 227 U.S.P.Q. 491 (1985). Rule 9(b) provides that "[in] all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Although the Rule does not require pleading of detailed evidentiary matters, at least the time, place and substance of any misrepresentation or material omission should be stated. *PPG Industries, Inc. v. Alanese Coating Co.*, 176 U.S.P.Q. 235, 236 (D.Md. 1972). Among the Rule's purposes in requiring particularization is "to deter the filing of charges of fraud as a pretext for discovery of unknown wrongs." *G & H Technology, Inc. v. United States*, 8 Cl.Ct. at 572, 227 U.S.P.Q. at 492. As explained by the Second Circuit in *Segal v. Gordon*, 467 F.2d 602, 607–08 (2d Cir.1972): "A [claim] alleging fraud should be filed only after a wrong is reasonably believed to have occurred; it should serve to seek redress for a wrong, not to find one."

Arco's sixth affirmative defense states, in full: "The '521, '148 and '844 patents were each procured by inequitable conduct before the United States Patent and Trademark Office and each is therefore invalid."[7] Nowhere does Arco's pleading specify the time, place or circumstances of the inequitable conduct. The answer makes no mention of the Spear and Le Comber manuscript, nor does it contain even a conclusory allegation that material "prior art" or a relevant prior "printed publication" was intentionally or recklessly concealed from the

Patent Office. Hence, the claim does not satisfy the specificity requirements of Rule 9(b), Fed.R.Civ.P. *See, e.g., Papst Motoren GMbH & Co. v. Kanematsu–Goshu (U.S.A.) Inc.*, 629 F.Supp. at 870–71 ("vague assert[ions] that Papst withheld relevant and material information 'about pertinent prior art affecting the patentability and validity of said Letters Patent ...'", deemed "inadequate" as "conclusory statements, which fail to state the circumstances constituting the fraud with any particularity ..."); *G & H Technology, Inc. v. United States*, 8 Cl.Ct. 572, 227 U.S.P.Q. 491 (conclusory allegation that plaintiff failed to meet its duties of candor and disclosure to the Patent Office, unsupported by any statement as to the circumstances, stricken under Rule 9(b)); and *Northern Engineering & Plastics Corp. v. Blackhawk Moulding Company, Inc.*, 205 U.S.P.Q. 609 (allegation "that plaintiff knowingly concealed from the United States Patent Office material facts, which, if revealed, would have constituted a statutory bar to the validity of the patent" held insufficient under Rule 9(b)).

It is hardly within the province of a discovery court to strike for insufficiency any portion of the pleading in a litigation being conducted before another tribunal. Nor is that the intention here. The sufficiency of the relevant allegations in such a pleading is, nonetheless, of significance in determining whether to compel the discovery sought to support it.

Here, as stated earlier, Arco's "inequitable conduct" defense fails to meet the specificity requirements of Rule 9(b), Fed. R.Civ.P. Moreover, Arco concededly *cannot* substantiate the defense with factual allegations in support of its theory that the RCA inventor of the '521 patent gained access to undisclosed "prior art" (the Spear and Le Comber manuscript) through the Society's anonymous referee. In papers submitted on this motion, Arco acknowledged the absence of any factual predicate to state such a claim "at this time."

---

7. Similarly, paragraph 12 of Arco's counterclaim states, without elaboration: "Each of the claims of the '521, '148 and '844 patents were procured by inequitable conduct on the part of RCA before the United States Patent and Trademark Office."

In this Circuit, it is established that, at least with respect to allegations of fraud or inequitable conduct, it is improper to use discovery in search of a factual predicate required to be pleaded in the first instance. *See, e.g., Segal v. Gordon*, 467 F.2d at 607–09; *Segan v. Dreyfus Corp.*, 513 F.2d 695, 696 (2d Cir.1975) (discovery constituting "an apparent effort to uncover other fraudulent transactions" properly denied as a "fishing expedition of large proportions" where facts alleged in complaint did not support it). *See also Leonard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 64 F.R.D. 432, 435 (S.D.N.Y. 1974) ("plaintiff should not be permitted to subject the defendants to protracted discovery proceedings on ... mere supposition, without more.... Such 'fishing-expeditions' are not to be condoned."). *C.f. Chubb Integrated Systems Ltd. v. National Bank of Washington*, 103 F.R.D. 52, 59 (D.D.C. 1984) (noting that although a court does not ordinarily rule on the sufficiency of a claim or defense in a discovery context, "[i]t is, of course, within the court's discretion to deny discovery related to a patently insubstantial claim, for example, where the claim or defense appears baseless and the discovery would work a hardship on the answering party," *citing, inter alia*, 4 J. Moore and J. Lucas, *Moore's Federal Practice* ¶ 26.51[1] at 26–125 (2d ed. 1983).

Here, absent any indication that there is even a modicum of substance to Arco's hypothesis of a "tie" between the referee and the inventor of the '521 patent, Arco's "need" for the requested discovery is reduced to its desire to uncover a factual predicate for its facially deficient "inequitable conduct" defense.[8] That "need", quite apart from the competing interests asserted by the Society, will not support an order compelling discovery.

### E. The Balance

In the instant case, once the competing interests are identified and analyzed, little remains to complete the task of striking the balance under Rule 26(c), Fed.R.Civ.P.

The Society has demonstrated a strong interest in preserving the confidentiality of its reviewer's identity, and the values it seeks to foster in resisting this disclosure have traditionally been accorded substantial weight in assessing the competing needs and hardships involved in pre-trial discovery.

Arco, by contrast, has shown little, if anything, to tip the scales in its favor. By its own admission on this motion, Arco has eliminated any legitimate justification for the discovery it seeks founded on an asserted need to establish an "inequitable conduct" defense. Further, it is only by a leap of imagination that Arco even advances the claim that disclosure of the reviewer's identity would assist in establishing defenses of "printed publication" or "prior art." Indeed, the Society's review procedures (which Arco does not contest), coupled with the controlling caselaw, virtually compel the conclusion that the requested discovery would disprove the noted defenses.

Of significance, too, in balancing the competing hardships, is the Society's status as a non-party to this litigation. Under the authorities, this factor is significant in "determining whether compliance [with a discovery demand] would constitute an undue burden." *Dow Chemical Co. v. Allen*, 672 F.2d at 1271. *Accord, Richards of Rockford Inc. v. Pacific Gas & Electric Co.*, 71 F.R.D. at 390; *Plough Inc. v. National Academy of Sciences*, 530 A.2d at 1160.

Arco is correct in noting that, as the Court of Appeals for the Federal Circuit has admonished: "A district court whose only connection with a case is supervision of discovery ancillary to an action in another district should be 'especially hesitant to pass judgment on what constitutes relevant evidence thereunder.'" *Truswal Systems Corp. v. Hydro–Air Engineering, Inc.*, 813 F.2d 1207, 1211–12 (Fed.Cir.1987) (citation omitted). It is similarly accurate that the expectation that discovery may be futile does not, as a general rule, justify barring

---

**8.** Contrary to Arco's arguments, neither the Society's failure to advise Dr. Spear of Dr. Fritzsche's favorable review of the manuscript nor the timing of the filing of the application for the '521 patent provides factual support for the hypothetical link.

that discovery altogether. *Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 563 (7th Cir.1984). The question presented here, however, is not whether marginally relevant discovery might otherwise be permissible in the absence of countervailing considerations. Rather, the Society has shown hardships attendant upon disclosure of its referee's identity which, under the authorities, require Arco to meet a higher standard of relevance to overcome the Society's need for confidentiality. Because Arco's showing falls far short of that higher standard, the Rule 26(c) balance of need against burden favors non-disclosure in this case.

Arco contends that a carefully drawn protective order can adequately safeguard the Society's interests and at the same time satisfy its need for the discovery sought. An order restricting disclosure of the referee's identity to those involved in the pending litigation would no doubt reduce the likelihood that a large number of potential reviewers would learn that their identities may at some time be disclosed. It would not, however, eliminate that risk, or at least the perception on the part of potential reviewers that such a risk exists. There would thus be a "chilling effect" on candid peer evaluations in the future. As Dr. Havens attested, "[i]f the confidentiality of the peer-review process is breached," there would remain a risk that "referees must provide their advice to the Society in the expectation that disclosure might occur." (Havens Declaration, ¶ 9). *Accord, Dow Chemical Company v. Allen*, 672 F.2d at 1278; *Apicella v. McNeil Laboratories, Inc.*, 66 F.R.D. at 85; *Plough, Inc. v. National Academy of Sciences*, 530 A.2d at 1160.

The failure of Arco to demonstrate more than a minimal level of "need" also supports an order barring disclosure. As the District of Columbia Court of Appeals recently held in analogous circumstances:

> In a case in which a higher level of need were shown, disclosure under such an order might be appropriate. Here, however, blanket protection is an appropriate remedy considering the balance of factors.

*Plough Inc. v. National Academy of Sciences*, 530 A.2d at 1160. That conclusion is equally appropriate here.

Finally, the factors emphasized by Arco in urging the adequacy of a protective order do not support a contrary result. Although Arco seeks to depose only a single reviewer, the disclosure sought, even limited to the context of this litigation, would, as indicated above, carry a risk that the Society's peer review process will be jeopardized. Moreover, passage of a decade since the anonymous reviewer critiqued the Spear and Le Comber manuscript does not mitigate the likelihood of a "chilling effect" on future scientific review if the reviewer's identity is disclosed now.

## CONCLUSION

For the foregoing reasons, Arco's motion to compel the Society to disclose the identity of its anonymous reviewer is denied.

SO ORDERED.