ACCEPTED
03-14-00801-CV
5229237
THIRD COURT OF APPEALS
AUSTIN, TEXAS
5/11/2015 12:23:32 PM
JEFFREY D. KYLE
CLERK

## NO. 03-14-00801-CV

In the Third Court of Appeals
Austin, Texas

THE UNIVERSITY OF TEXAS SYSTEM AND THE UNIVERSITY OF TEXAS AT DALLAS
*Appellants,*
v.
KEN PAXTON, ATTORNEY GENERAL OF THE STATE OF TEXAS
*Appellee,*
v.
MARILYN CAMERON,
*Intervenor.*

On Appeal from the 261st Judicial District Court of Travis County, Texas
Trial Court Cause No. D-1-GV-11-001923
The Honorable Stephen Yelenosky, Judge Presiding

### APPELLANTS' BRIEF

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for
Defense Litigation

ROBERT O'KEEFE
Division Chief,
Financial Litigation, Tax, and
Charitable Trusts Division

H. MELISSA MATHER
Assistant Attorney General
State Bar No. 24010216
Financial Litigation, Tax, and
Charitable Trusts Division
P.O. Box 12548 (MC 017-6)
Austin, Texas 78711-2548
Tel: (512) 475-2540
Fax: (512) 477-2348
melissa.mather@texasattorneygeneral.gov

**Counsel for Appellants,**
**The University of Texas System and**
**The University of Texas at Dallas**

ORAL ARGUMENT REQUESTED

# IDENTITY OF PARTIES AND COUNSEL

*Appellant*

The University of Texas System and The University of Texas at Dallas

**Lead counsel for Appellants, The University of Texas System and The University of Texas at Dallas**
H. Melissa Mather
Assistant Attorney General
State Bar No. 24010216
Office of the Attorney General
Financial Litigation, Tax, and Charitable Trusts Division
P.O. Box 12548
Austin, Texas 78711-2548
Tel.: (512) 475-2540
Fax: (512) 477-2348
melissa.mather@texasattorneygeneral.gov

*Appellee*

Ken Paxton, Attorney General of Texas

**Lead counsel for Appellee, Attorney General**
Kimberly L. Fuchs
State Bar No. 24044140
Chief, Open Records Litigation
Administrative Law Division
P.O. Box 12548
Austin, Texas 78711-2548
Phone: (512) 475-4195
Fax: (512) 320-0160
kimberly.fuchs@texasattorneygeneral.gov

*Intervenor, proceeding pro se*
Marilyn Cameron
18222 Outback Lakes Trail
Humble, Texas 77346
mizcameron@yahoo.com

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ................................................................ ii

TABLE OF CONTENTS ......................................................................................... iii

INDEX OF AUTHORITIES ................................................................................... iv

STATEMENT OF THE CASE ................................................................................ vi

STATEMENT REGARDING ORAL ARGUMENT ............................................... vi

ISSUE PRESENTED ............................................................................................. vii

STATEMENT OF FACTS ........................................................................................ 2

SUMMARY OF ARGUMENT ................................................................................. 8

ARGUMENT ........................................................................................................... 10

    I.    De novo review applies to the grant of a defendant's motion for traditional summary judgment .............................................................................................. 10

    II.    The Attorney General provided no evidence affirmatively negating the University's right to relief .......................................................................................... 11

    III.    In the alternative, this Court should remand for the trial court to apply a modern and robust privacy analysis .......................................................................... 13

PRAYER .................................................................................................................. 19

CERTIFICATE OF COMPLIANCE ...................................................................... 20

CERTIFICATE OF SERVICE ............................................................................... 20

APPELLANTS' APPENDIX ................................................................................... 21

# INDEX OF AUTHORITIES

**Cases**

*Cathey v. Booth*,
900 S.W.3d 339 (Tex. 1995) ....................................................................... 10

*Dow Chemical Co. v. Allen*,
672 F.2d 1262 (7th Cir. 1982) ................................................................... 16

*Hubert v. Harte-Hanks Texas Newspapers, Inc.*,
652 S.W.2d 546 (Tex. App. - Austin 1983, writ ref'd n.r..e) ....................... 13

*In re Request from the United Kingdom Pursuant to Treaty Between Government of U.S. and Government of the United Kingdom on Mut. Assistance in Criminal Matters in the Mater of Dolours Price*,
685 F.3d 1 (1st Cir. 2012) ........................................................................ 17

*Industrial Foundation of the South v. Tex. Indus. Accident Bd.*,
540 S.W.2d 668 (Tex. 1976) ................................................................passim

*Kelly v. C.I.A.,*
2002 WL 34463900 (D.D.C. Aug. 8, 2002), ............................................... 16

*Murphy v. Phillip Morris*,
1999 WL 33521196 (C.D. Cal. Dec. 28, 1999) .......................................... 15

*Nexstar Broad., Inc. v. Fidelity Communications Co.*,
376 S.W.3d (Tex. App. – Dallas 2012, no pet.) ........................................... 10

*Rhone-Poulenc, Inc. v. Steel*,
997 S.W.2d 217 (Tex. 1999) ................................................................ 11, 12

*Solorex Corp. v. Arco*,
121 F.R.D. 163 (E.D.N.Y. 1988) ............................................................... 17

*Tex. Comptroller of Public Accounts v. Attorney General of Texas*,
244 S.W.3d 629 (Tex. App. – Austin 2008, pet. granted) ................. 11, 12, 14, 15

*Tex. Dep't of Pub. Safety v. Cox Tex. Newspapers, L.P.*,
343 S.W.3d 112 (Tex. 2011) ..................................................................... 11

*Travelers Ins. Co. v. Joachim*,
315 S.W.3d 860 (Tex. 2010) ..................................................................... 10

*United Protective Servs., Inc. v. W. Vill. Ltd. P'ship*,
180 S.W.3d 430 (Tex. App.-Dallas 2005, no pet.) ....................................... 10

**Statutes**

45 C.F.R. § 46.116(a)(5) ............................................................................................ 4

45 C.F.R. § 690.116(a)(5) .......................................................................................... 4

Tex. Gov't Code § 551.301 ....................................................................................... 5

Tex. Gov't Code § 552.001 ....................................................................................... 7

Tex. Gov't Code § 552.101 ................................................................................passim

Tex. Gov't Code § 552.325(a) .................................................................................. 7

## STATEMENT OF THE CASE

Appellants, the University of Texas System and The University of Texas at Dallas (collectively, the University) filed suit against Greg Abbott, then the Attorney General of Texas, on December 9, 2011, seeking a declaratory judgment that the University was not required to comply with letter ruling OR2011-17401, ordering the disclosure of certain information withheld by the University in response to an open records request. CR 3-6.[1] Ms. Marilyn Cameron filed a plea in intervention on January 18, 2012. CR 13.

On October 22, 2014, the University filed Plaintiffs' Motion for Final Summary Judgment. CR 30. On October 23, 2014, the Attorney General filed Defendant Attorney General's Cross-Motion for Summary Judgment and Notice of Hearing. CR 57. On November 24, 2014, the trial court denied the University's motion, and granted the motion filed by the Attorney General. CR 84-85. This appeal followed. CR 86-87.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument, and believes that argument would assist the Court in resolving the issues presented by the appeal.

---

[1] References to the one-volume clerk's record will appear as "CR __", with a number indicating the page of the record.

# ISSUE PRESENTED

Did the trial court err in granting the Attorney General's motion for summary judgment, brought under the traditional standard for a defending party set out in Tex. R. Civ. P. 166a(c), when the motion attached no evidence and did not address specific factual issues that precluded the Attorney General from affirmatively negating the University's right to relief?

**NO. 03-14-00801-CV**

In the Third Court of Appeals
Austin, Texas

THE UNIVERSITY OF TEXAS SYSTEM AND THE UNIVERSITY OF TEXAS AT DALLAS
*Appellants,*

v.

KEN PAXTON, ATTORNEY GENERAL OF THE STATE OF TEXAS
*Appellee,*

v.

MARILYN CAMERON
*Intervenor.*

On Appeal from the 261st Judicial District Court of Travis County, Texas
Trial Court Cause No. D-1-GV-11-001923
The Honorable Stephen Yelenosky, Judge Presiding

**APPELLANTS' BRIEF**

TO THE HONORABLE JUSTICES OF THE COURT:

A person who agrees to participate as a human research subject in a social science experiment conducted at the University of Texas should not have her identity publicly disclosed and associated with the results of the study. To force public universities in Texas to release this information under the Texas Public Information Act (PIA) upon request would damage the ability of our universities to conduct ground-breaking research, to receive grants for experimental research in the social sciences, such as economics and sociology, and to comply with federal law governing the use of human subjects in research studies.

1

In this appeal, all the University seeks is a remand to allow it to prove, at a trial on the merits, that the information at issue qualifies as confidential under the relevant legal standard. Granting this request would allow a full hearing to take place below, and resolve this appeal without endorsing an interpretation of the Texas Public Information Act that would prevent state universities from being able to conduct sound scientific research in the areas of economics, sociology and other social sciences.

**STATEMENT OF FACTS**

**I.    Human research subjects participate in a study investigating the behavior of terrorists and those engaged in counter-terrorism, conducted by faculty at The University of Texas at Dallas.**

In late 2008, a professor in the economics department at The University of Texas at Dallas, submitted a proposal to the National Science Foundation for funding to conduct a study entitled "Behavioral Insights into National Security Issues." CR 54. The proposal sought to use laboratory experiments to test for "behavioral accuracy" certain theories of "terrorism, counterterrorism, prevention and security." Three sets of experiments are described in the proposal. *Id.*

The first experiment involves asking human subjects to play an "attack and defense" game, in which "[t]wo players allocate a limited number of resources over a fixed number of targets . . . [and] the side with the most resources on a target wins it." *Id.* Human research subjects would be observed playing the game, and researchers

2

would attempt to "identify how individual play is consistent with or deviates from" theoretical predictions about how terrorists choose certain targets, and how nations act to protect certain targets. *Id.*

The second experiment uses human research subjects to explore "cooperation among countries in the decision to pursue terrorist organizations, protect their own territory, or do nothing." *Id.* In this experiment, human research subjects are observed as they choose whether to behave cooperatively, act to protect their own resources, or do nothing. *Id.* Variables in the game are changed in various iterations, to mimic the effect of trade sanctions or the implementation of international cost-sharing rules. *Id.* The actions of the human subjects are observed to "identify psychological regularities which are likely to apply across a large segment of the population," including "biases and heuristics which lead individuals to make sub-optimal decisions." *Id.*

The third experiment uses human research subjects to explore the motivations behind terrorist suicide attacks. *Id.* Participants in the study are asked to "volunteer to give up their earnings to improve the performance of others in their own group," while variables such as the "size and nature of the advantage, the group identity and the amount and type of improvement received" are modified by the researchers to see at what point "volunteering," which in this study constitutes a stand-in for committing a suicide terrorist attack, becomes more or less attractive to the participants. *Id.* Researchers conducting the study hoped to "improve decision making by identifying the mistakes enemies are likely to make, and helping to describe strategies to exploit

3

[those mistakes]." *Id.*

Participants in the study were provided with a consent form in compliance with

45 C.F.R. § 46.116(a)(5) and 45 C.F.R. § 690.116(a)(5), that stated, under the heading

"Records of Participation in this Research":

> All the information participants provide to investigators as part of this research will be protected and held in confidence within the limits of the law and institutional regulation. Data will be stored by code number only, and will be available only to the researchers. We will not share any personal contact information.

CR 55-56.

## II. The intervenor in this case submits a public information request to The University of Texas at Dallas.

In September 2011, the University received a public information request from

the intervenor in this case, Ms. Marilyn Cameron. CR 43.

The request sought information on three separate studies, including the

"Behavioral Insights into National Security Issues" study described above. *Id.* The

other two studies were conducted by the same professor of economics, and were titled

"Caring for Others . . . It's Not (Just) About the Money," and "An Artefactual Field

Experiment on Information from the Social Network: Implications for Immigration."

*Id.*

The request contained several types of questions and/or requests for categories

of documents, including "Can you define for me the exact location of each

experiment?"; a request for copies of any "continuing review" of the listed studies;

4

copies of any reports on "adverse events" associated with the studies; copies of consent forms from the participants; and a "list of names of all subjects." *Id.*

The University notified the requestor that it did not have documents responsive to most of her requests, but did provide the requestor with copies of blank consent forms, and a copy of the original proposal submitted to the National Science Foundation. CR 52-56. The University further noted that it had a record of the names of human research subjects who participated in the national security/terrorism study, but would not release those names because it believed the information to be confidential under Tex. Gov't Code § 552.101. CR 48-50.

## III. The University seeks to withhold the names of human research subjects participating in the study.

Pursuant to Tex. Gov't Code § 551.301, the University sought a letter ruling from the Open Records Division of the Texas Attorney General (ORD), regarding the question of whether the names of study participants were confidential by law. CR 48-50. The University noted in its brief to ORD that "the individuals [participating in the study] received informed consent statements indicating that their participation would be kept confidential and as such, had a reasonable expectation of privacy." CR 50. The University further argued that "[w]hether an individual has agreed to participate as a human subject for research conducted by a University professor is a personal matter, and the release of such information would be highly offensive to a reasonable person." CR 50-51.

The requestor responded to ORD as well, in support of her request, stating that she sought the list of names to determine "who was not on the list instead of who was on it," because she was concerned that "there may be individuals who may become 'subjects' without proper consent." CR 23. The requestor further stated, putting this sentence in bold, that she "personally would not give written consent to be a human subject in any of these projects." CR 25.

The letter ruling issued by ORD noted that "[S]ection 552.101 . . . excepts from disclosure 'information considered to be confidential by law, either constitutional, statutory, or by judicial decision.'" CR 69. The letter ruling interpreted this language to encompass both "constitutional and common-law rights to privacy," but, citing the Texas Supreme Court's plurality opinion in *Industrial Found. of the South v. Tex. Indus. Accident Bd.*, 540 S.W.2d 668 (Tex. 1976), stated that the doctrine of common-law privacy was limited to the protection of information that "(1) contains highly intimate or embarrassing facts, the publication of which would be highly objectionable to a reasonable person, and (2) is not of legitimate concern to the public." *Id.*

The letter ruling further interpreted the doctrine of constitutional privacy as "reserved for the most intimate aspects of human affairs," protecting an even narrower scope of information than that protected under the common-law doctrine of privacy. *Id.*

Applying these standards, the letter ruling found that the University had not demonstrated that public disclosure of the names of human research subjects

6

participating in the national security/terrorism study would constitute the disclosure of "highly intimate or embarrassing" information, and that the University had not shown that the information was "not a matter of legitimate public interest." CR 70.

## IV. The University files suit, and both parties seek summary judgment.

The University filed suit against the Attorney General to challenge the letter ruling issued by ORD. CR 3. Ms. Cameron, the requestor, intervened in the suit, as permitted by Tex. Gov't Code § 552.325(a). CR 13.

The University moved for summary judgment, attaching several documents related to the national security/terrorism study, and arguing that the content of the study and the expectation of the participants established that the names of participants were confidential as a matter of law under Tex. Gov't Code § 552.001. CR 30-56.

The Attorney General moved for summary judgment as well, arguing that it was entitled to judgment as a matter of law because the "names of human research subjects are not confidential under Tex. Gov't Code § 552.101 in conjunction with either common-law privacy or constitutional privacy." CR 57-70. The only attachment to the Attorney General's motion was the letter ruling that ORD previously provided to the University. CR 68-70.

Ms. Cameron, the pro se intervenor, filed a response stating that she had "initiated [her] request due to concern that implementation of funded grants may have moved out of the lab and into the general public without the knowledge and informed consent of citizen participants." CR 72. Intervenor also stated that she "believed that

7

individuals may have been 'drafted' into the experimental labs which, as mentioned in the Plaintiffs' motion, can collect information that can be intimate, embarrassing, with behaviors and ideas that can be objectionable, if published." *Id.* Intervenor believed that she herself might have been "unwittingly drawn into the experimental labs." *Id.*

The trial court denied the University's motion for summary judgment, but granted the motion filed by the Attorney General, finding that "the information at issue is not privileged and the University must disclose this information to the requestor." CR 84.

## SUMMARY OF ARGUMENT

In his traditional motion for summary judgment, the Attorney General provided the court with nothing more than legal argument to establish that he was entitled to judgment as a matter of law. While many issues involving the Public Information Act are pure questions of law, the application of the exception for information covered by common-law or constitutional privacy centers unavoidably on fact-specific questions, such as:

- what a disclosure reveals, or could reveal, about the particular people whose information might be disclosed;

- whether and to what extent reasonable people might view the disclosure as revealing information that is "highly intimate" or "embarrassing"; and

- the extent of the potential consequences from disclosure, both for the agency

8

and for the particular individuals whose personal information is at stake.

Because the Attorney General supported his motion with no evidence that could negate as a matter of law the applicability of the confidentiality exception, or establish as a matter of law an affirmative defense, the Attorney General's motion should have been denied. On that basis alone, the trial court's judgment should be reversed, and the case remanded for a full trial on the merits.

In the alternative, the University asks that the Court remand this matter to the district court with instructions to apply a more robust legal framework for addressing privacy concerns than that provided by the "highly intimate or embarrassing" test laid out by the Texas Supreme Court almost 40 years ago in the plurality opinion, *Industrial Foundation of the South v. Tex. Indus. Accident Bd.*, 540 S.W.2d 668 (Tex. 1976). As applied by the district court, the *Industrial Foundation* test unnecessarily truncated the consideration of interests crucial to the University and the public in this case. Specifically, the University and its faculty have a Constitutionally protected interest in academic freedom, embodied in part by the First Amendment, that must be addressed in asking whether the University or its faculty will be forced to publicly disclose the identity of human subjects participating in their research.

Any test articulated by this Court applicable to claims for an exception to disclosure under § 552.101 should provide a way for trial courts to consider these crucial issues in assessing the applicability of § 552.101, and a remand would be appropriate in order to allow the trial court to apply this modified standard.

9

## ARGUMENT

**I. De novo review applies to the grant of a defendant's motion for traditional summary judgment.**

Review of the trial court's grant of a traditional summary judgment is de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 864 (Tex. 2010)). A party moving for traditional summary judgment under Texas Rule of Civil Procedure 166a(c) has the burden to establish that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Id.* "In reviewing a summary judgment, we must accept as true all evidence in favor of the nonmovant, indulging every reasonable inference and resolving all doubts in the nonmovant's favor." *Cathey v. Booth*, 900 S.W.3d 339, 342 (Tex. 1995).

The fact that the University also moved for summary judgment below, but is not challenging the denial of that motion on appeal, does not change the standard of review applied to the Attorney General's motion, and does not lessen the Attorney General's burden in demonstrating that it is entitled to judgment as a matter of law. *See Nexstar Broad., Inc. v. Fidelity Communications Co.*, 376 S.W.3d 377, 382 (Tex. App. – Dallas 2012, no pet.) ("When . . . both parties move for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law; neither party can prevail because of the other's failure to discharge its burden."); *United Protective Servs., Inc. v. W. Vill. Ltd. P'ship*, 180 S.W.3d 430, 432 (Tex. App.-Dallas 2005, no pet.) (noting that reversal and remand of a case involving cross-motions for summary judgment is

10

proper "if neither party has met its summary judgment burden").

## II. The Attorney General provided no evidence affirmatively negating the University's right to relief.

The trial court erred in granting the Attorney General's traditional motion for summary judgment because the motion attached no evidence, and did not address the specific factual issues necessary to resolve this case. *See Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 221 (Tex. 1999) (defendant not entitled to summary judgment because it did not affirmatively negate any element of the plaintiff's case). Specifically, in order to determine whether the University must publicly disclose the names of people participating as human research subjects in the terrorism/national security study at issue, the trial court should consider what that disclosure would reveal, or could reveal, about the particular people whose information might be disclosed. *See Industrial Foundation*, 540 S.W.2d at 683 (discussing possible information that may be revealed by the disclosure of worker's compensation claims); *Tex. Dep't of Pub. Safety v. Cox Tex. Newspapers, L.P.*, 343 S.W.3d 112, 119 (Tex. 2011) (noting, in a discussion of a public safety exception to the PIA that "[t]he dividing line between disclosure and restraint must be determined by proof"). Relevant facts will also include whether and to what extent reasonable people would view the disclosure as revealing information that is "highly intimate" or "embarrassing". *Industrial Foundation*, 540 S.W.2d at 683; *Tex. Comptroller of Public Accounts v. Attorney General of Texas*, 354 S.W.3d 336, 345 (Tex. 2010) (finding that state employees have a "nontrivial privacy interest" in their dates of birth,

based in part on an assessment that reasonable people would be concerned about the public release of this information). In addition, the court should consider the extent of the potential consequences from disclosure, both for the agency and for the particular individuals whose personal information is at stake. *Industrial Foundation,* 540 S.W.2d at 686; *see also Cox,* 343 S.W.3d at 120 (noting that "information does not exist in a vacuum," and that the Court "cannot ignore [the] consequences [of disclosure] when deciding whether common law protections apply"); *Comptroller,* 354 S.W.3d at 343-346 (finding that state employees have a "nontrivial privacy interest" in their dates of birth, based in part on "the reality of technology" and how the information could be used).

While the Attorney General cited several cases in its motion, and argued that the interpretation of the PIA is a matter of law, the Attorney General's motion attached no evidence related to the terrorism/national security study at issue, and did not delve into the particulars of the study or any evidence regarding what reasonable people might think about being publicly identified as participants in the study. CR 57-67. Without engaging with these facts, the motion cannot affirmatively negate, as a matter of law, the application of the confidentiality exception codified in § 552.101. *See Industrial Foundation,* 540 S.W.2d at 685-86 (reversing a grant of summary judgment to the requestor, and remanding to the trial court for a fact-specific analysis of the claims of confidentiality, as applied to each record at issue); *Rhone-Poulenc,* 997 S.W.2d at 221 (defendant not entitled to summary judgment because it did not affirmatively negate any element of the plaintiff's case).

12

To conduct the proper analysis in similar cases, other courts have relied on an assessment of particular facts. *See Cox,* 343 S.W.3d at 118 (holding that "[o]n remand, the trial court must closely examine each of the disputed documents" to determine if it meets the standard for an applicable exception to disclosure); *Industrial Foundation*, 540 S.W.2d 685-86 (reversing the trial court's grant of summary judgment to the requestor, and remanding for a fact-specific assessment of the applicability of the confidentiality exception); *see also Hubert v. Harte-Hanks Texas Newspapers, Inc.*, 652 S.W.2d 546, 551 (Tex. App. - Austin 1983, writ ref'd n.r.e) (noting that judgment was rendered after a bench trial, and that "fact questions as to the effect of disclosure [are assumed to have been] resolved by the district court against appellants"). Here, the trial court erred by granting summary judgment to the Attorney General based on a legal argument, devoid of fact-specific evidence demonstrating that the confidentiality exception could not apply as a matter of law.

## III.   In the alternative, this Court should remand for the trial court to apply a modern and robust privacy analysis.

The development of privacy law in the state of Texas did not end in 1976 with the publication of the Texas Supreme Court's plurality opinion in *Industrial Foundation*. The University urges this Court to remand this case with instructions for the trial court to apply a modern and robust privacy analysis, taking into account all the recent pronouncements from the Texas Supreme Court that bear on this issue.   Such a test would require serious consideration of not only the sensibilities of the participants in

13

the study, but also the University's right to academic freedom, and the potential consequences for public research if the names of human research subjects in these studies become publicly available information.

The limitations of *Industrial Foundation* – a plurality opinion, written almost 40 years ago by a fractured court – have been noted in recent cases addressing the PIA. *See, e.g., Comptroller*, 354 S.W.3d at 361 (Wainwright, J., dissenting) (noting that "[t]his Court's only interpretation of section 551.101 was the subject of a fractured opinion," including a "three justice plurality, two separate concurrences, and a four justice dissent"). The plaintiff in *Industrial Foundation* was a trade association that sought the names of individuals who had filed workers compensation claims with the state, along with the details of the medical conditions resulting in those claims. *Industrial Foundation*, 540 S.W.2d at 672. Writing long before the Health Insurance Portability and Accountability Act (HIPAA) was passed in 1996, the Court hesitated in deciding that information in private medical claims should be construed as "confidential," without some parsing of particular types of claims - such as mental illness or injury to genitalia - that might qualify for the confidentiality exception. *Id.* at 681, 683 (noting that absent a specific provision addressing medical records, the Court would not construe the confidentiality provisions of the predecessor to the PIA to generally encompass such records, although noting that "at least some" of the records identified by the state agency as involving claims of sexual assault, suicide and psychiatric treatment may qualify).

More recent cases have acknowledged that *Industrial Foundation* does not announce a one-size-fits-all test for an assessment of confidentiality under § 552.101. In *Cox*, for example, the Texas Supreme Court recognized that *Industrial Foundation* dealt with a particular "branch of the invasion of privacy tort," but not with "other matters that are confidential under judicial decision." 343 S.W.3d at 117. Also, in *Comptroller v. Attorney General*, a case in which the Texas Supreme Court held that the birth dates of state employees did constitute private information, the Court recognized that our ideas of what constitutes private information must be formed in the context of modern society, with a realistic view of the benefits and costs of disclosure. 354 S.W.3d at 343 ("Nor can we ignore the reality of technology [in assessing whether state employees have a privacy interest in their dates of birth].").  Indeed, the *Comptroller* Court's majority opinion quotes favorably from a United States Supreme Court decision interpreting the federal Freedom of Information Act, stating that the purpose of FOIA "is not fostered by disclosure of information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct." *Id.* at 346 (quoting *DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989)).

Other states confronting requests for disclosure of the names of human research subjects have characterized the court's duty to "avoid . . . unnecessary disclosure of the personal identities of . . . study participants" as "unarguable." *See Murphy v. Phillip Morris*, 1999 WL 33521196, *3 (C.D. Cal. Dec. 28, 1999) ("[T]here is a strong public policy

interest in protecting the identities of the study participants so that public health/academic research will not be stymied.").

Similarly, in *Kelly v. C.I.A.,* 2002 WL 34463900 (D.D.C. Aug. 8, 2002), a federal district court allowed the CIA to withhold the names of test subjects from a FOIA response. In describing its holding, the court deemed the "privacy interests of the test subjects" to be "significant in light of the stigma and embarrassment over being associated with the project," in addition to the "likelihood that the individuals would be harassed for additional details concerning the program . . . and because the release of the names would not further the public interest by shedding any additional light on the CIA's activities in the . . . program." *Id.* at *21.

In *Dow Chemical Co. v. Allen*, 672 F.2d 1262 (7th Cir. 1982), a federal appeals court refused to enforce a subpoena for academic research notes compiled by researchers at the University of Wisconsin based on "academic freedom" as a component of the First Amendment right to free speech. *Id.* at 1275. Recognizing that the right was not absolute, the court nevertheless emphasized that "[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *Id.* at 1276 (quoting *Keyishian v. Board of Regents*, 385 U.S. 589, 604-05 (1967)). The Court reasoned that "enforcement of the subpoenas would leave the researchers with the knowledge throughout continuation of their studies that the fruits of their labors had been appropriated by and were being scrutinized by a not-unbiased third party whose interests were arguably antithetical to theirs." *Id.* Under

16

these circumstances, the court found it "not difficult to imagine that that realization might well be both unnerving and discouraging," to the point that the intervention "would 'inevitably tend to check the ardor and fearlessness of scholars, qualities at once so fragile and so indispensable for fruitful academic labor.'" *Id.* (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 262 (1957) (Frankfurter, J., concurring in the result)).

Other courts have permitted academic institutions to withhold disclosure of the names and identities of peer-reviewers who contribute to the tenure decision-making process, based in part on First Amendment protections for academic freedom. *See, e.g., Solorex Corp. v. Arco*, 121 F.R.D. 163, 173 (E.D.N.Y. 1988) (collecting cases).

The only prior case, federal or state, in which disclosure of the identity of a human research subject appears to have been ordered is *In re Request from the United Kingdom Pursuant to Treaty Between Government of U.S. and Government of the United Kingdom on Mut. Assistance in Criminal Matters in the Mater of Dolours Price*, 685 F.3d 1 (1st Cir. 2012), although that order was stayed by the United States Supreme Court and later rendered moot. In that case, England sought the United States' assistance to compel the disclosure of interviews of various Irish Republican Army combatants conducted at Boston College. *Id.* at 3. The interviews had been conducted as part of a social science study into why individuals engage in violent political behavior. *Id.* at 4-5. The Supreme Court stayed the order mandating disclosure, but then denied the petition for certiorari, and the petitioners later died. *See Moloney v. United States*, 133 S.Ct. 9 (2012) (staying mandate); 133 S. Ct. 1796 (2013) (denying certiorari). In support of the petition for

17

certiorari, a group of social scientists filed an amicus brief urging the Court to reverse the order enforcing the subpoena, based on the need for social scientists to be able to assure confidentiality to their human research subjects in order to conduct sound scientific research. *See* Brief of Social Science Scholars as Amici Curiae Supporting Petitioners, 2012 WL 6703005. The scientists noted that without assurances of confidentiality, "many persons will be unwilling to speak with researchers, limiting the scope of social science research and leaving irreparable lacunae in human knowledge. The public will ultimately pay the price, because the sort of research at issue here is critical to studies that inform policymakers seeking to manage civil strife." *Id.* at \*8-9 (App. Tab 4 at 7). A full copy of that amicus brief is attached as part of the appendix, for the Court's reference.

If this Court does not reverse the grant of summary judgment for its lack of evidence or fact-specific proof, the University requests that the Court remand the case to the trial court with instructions to reassess the motion in light of a broader interpretation of the right to privacy in the context of research conducted by academic institutions.

## PRAYER

The University asks that the Court reverse the trial court's grant of summary judgment to the Attorney General, and remand the case for further proceedings.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

ROBERT O'KEEFE
Division Chief
Financial Litigation, Tax, and Charitable Trusts Division


*/s/ H. Melissa Mather*
H. Melissa Mather
State Bar No. 240102216
Assistant Attorney General
Financial Litigation, Tax, and Charitable Trusts Division
P.O. Box 12548
Austin, TX 78711-2548
(512) 475-2540 - Telephone
(512) 477-2348 – Fax
melissa.mather@texasattorneygeneral.gov

## CERTIFICATE OF COMPLIANCE

In compliance with Texas Rule of Appellate Procedure 9.4(i)(2), this brief contains 4,334 words, excluding the portions of the brief exempted by Rule 9.4(i)(1).

*/s/ H. Melissa Mather*
H. Melissa Mather

## CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2015, a true and correct copy of the *Appellants' Brief* was served via e-service and/or e-mail, to the following:

Kimberly L. Fuchs
Chief, Open Records Litigation
Administrative Law Division
P.O. Box 12548, Capital Station
Austin, Texas 78711-2548
kimberly.fuchs@texasattorneygeneral.gov
*Attorney for Appellee Attorney General*

Marilyn Cameron
18222 Outback Lakes Trail
Humble, Texas 77346
mizcameron@yahoo.com
*Intervenor/pro se*

*/s/ H. Melissa Mather*
H. Melissa Mather

## APPELLANTS' APPENDIX

Final Judgment..................................................................................Tab No. 1

Tex. Gov't Code 552.021 ................................................................Tab No. 2

Tex. Gov't Code 552.101 ................................................................Tab No. 3

Brief of Social Science Scholars as Amici Curiae Supporting Petitioners ........Tab No. 4



APPELLANTS' APPENDIX TAB 1

Filed in The District Court
of Travis County, Texas
NOV 2 4 2014
At_____ 10:14 A_M.
Amalia Rodriguez-Mendoza, Clerk

CAUSE NO. D-1-GV-11-001923

| | | |
|---|---|---|
| THE UNIVERSITY OF TEXAS SYSTEM and THE UNIVERSITY OF TEXAS AT DALLAS, *Plaintiffs*, | § § § § § | IN THE DISTRICT COURT OF |
| v. | § § | |
| GREG ABBOTT, ATTORNEY GENERAL OF TEXAS, *Defendant* | § § § § | 261st JUDICIAL DISTRICT |
| v. | § § | |
| MARILYN CAMERON, PRO SE *Intervenor.* | § § | TRAVIS COUNTY, TEXAS |

## FINAL JUDGMENT

On November 24, 2014, a hearing was held on the parties' motions for summary judgment. Plaintiffs The University of Texas System and The University of Texas at Dallas (the University) and Defendant Greg Abbott, Attorney General of Texas, appeared through counsel. This is a lawsuit under the Public Information Act, by which Plaintiff sought relief from a ruling of the Attorney General. The Court, having considered the testimony and documentary evidence, the pleadings, and arguments of counsel, enters the following declaration and orders.

IT IS THEREFORE ORDERED AND DECLARED that Defendant's Cross-Motion for Summary Judgment is GRANTED, and Plaintiff's Cross-Motion for Summary Judgment is DENIED. It is further ORDERED that the information at issue is not privileged and the University must disclose this information to the requestor.

**EXHIBIT**

**Tab No. 1**

This Order disposes of all claims between all parties and is a final judgment.

Signed this ___24ᵗʰ___ day of ___November___, 2014.

_____
JUDGE PRESIDING

Agreed As To Form:


_____
KIMBERLY FUCHS
Chief, Open Records Litigation
State Bar No. 24044140
Administrative Law Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone:    (512) 475-4195
Facsimile:    (512) 320-0167
Kimberly.Fuchs@texasattorneygeneral.gov

ATTORNEY FOR DEFENDANT GREG ABBOTT,
ATTORNEY GENERAL OF TEXAS


_____
JOSHUA R. GODBEY
State Bar No. 24049996
Assistant Attorney General
Financial and Tax Litigation Division
P.O. Box 12548
Austin, Texas 78711-2548
Telephone:    (512) 475-4209
Facsimile:    (512) 477-2348
joshua.godbey@texasattorneygeneral.gov

ATTORNEY FOR PLAINTIFFS



APPELLANT'S APPENDIX TAB 2





**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
  Government Code (Refs & Annos)
    Title 5. Open Government; Ethics (Refs & Annos)
      Subtitle A. Open Government
        Chapter 552. Public Information (Refs & Annos)
          Subchapter B. Right of Access to Public Information
            ➡➡ **§ 552.021. Availability of Public Information**

Public information is available to the public at a minimum during the normal business hours of the governmental body.

CREDIT(S)

Added by Acts 1993, 73rd Leg., ch. 268, § 1, eff. Sept. 1, 1993. Amended by Acts 1995, 74th Leg., ch. 1035, § 2, eff. Sept. 1, 1995.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT



EXHIBIT
Tab No. 2

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



APPELLANTS' APPENDIX TAB 3


C

**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
  Government Code (Refs & Annos)
    Title 5. Open Government; Ethics (Refs & Annos)
      Subtitle A. Open Government
        Chapter 552. Public Information (Refs & Annos)
          Subchapter C. Information Excepted from Required Disclosure
          ➔➔ **§ 552.101. Exception: Confidential Information**

Information is excepted from the requirements of Section 552.021 if it is information considered to be confidential by law, either constitutional, statutory, or by judicial decision.

CREDIT(S)

Added by Acts 1993, 73rd Leg., ch. 268, § 1, eff. Sept. 1, 1993.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT



APPELLANTS' APPENDIX TAB 4

2012 WL 6703005 (U.S.) (Appellate Petition, Motion and Filing)
Supreme Court of the United States.

Ed MOLONEY and Anthony McIntyre, Petitioners,

v.

UNITED STATES, et al., Respondents.

No. 12-627.
December 19, 2012.

On Petition For Writ Of Certiorari To The United
States Court Of Appeals For The First Circuit

**Brief of Social Science Scholars as Amici Curiae Supporting Petitioners**

Amit Kurlekar, Akin, Gump, Strauss, Hauer & Feld LLP, 580 California Street, Suite 1500, San Francisco, CA 94104, 415-765-9500, akurlekar @akingump.com.

L. Rachel Lerman, Counsel of Record, Anya Stein, Akin, Gump, Strauss, Hauer & Feld LLP, 2029 Century Park East, Suite 2400, Los Angeles, CA 90067, 310-229-1000, rlerman@akingump.com, astein@akingump.com, Attorneys for Amici Curiae.

**\*i** TABLE OF CONTENTS

| | |
|---|---|
| INTEREST OF *AMICI CURIAE* ......................................................... | 1 |
| STATEMENT OF THE CASE ............................................................. | 3 |
| SUMMARY OF ARGUMENT ............................................................. | 7 |
| REASONS THE WRIT SHOULD BE GRANTED ............................. | 10 |
| REVIEW IS NEEDED TO CLARIFY THE SCOPE OF THE LAW PROTECTING ACADEMIC RESEARCHERS FROM DISCLOSURE OF CONFIDENTIAL MATERIALS, INCLUDING THE IDENTITY OF RESEARCH PARTICIPANTS .......................... | 10 |
| A. Contrary to the Court of Appeals' holding, the First Amendment provides journalists a qualified right to maintain the confidentiality of their sources, even in grand jury proceedings ................................. | 10 |
| B. Preservation of confidentiality is at least as important to social science researchers as it is to newspaper journalists because it is essential to their academic enterprise ................................................... | 13 |
| C. This Court should grant the writ to resolve lower court confusion over the scope of the constitutional right to academic freedom .......... | 18 |
| CONCLUSION ................................................................................ | 23 |
| APPENDIX: LIST OF SCHOLARS ................................................. | App. 1 |

**\*ii** TABLE OF AUTHORITIES

Cases
*Bd. of Regents of Univ. of Wisc. Sys. v. Southworth*, 529 U.S. 217 (2000) ...................... 19

EXHIBIT

Tab No. 4

*Branzburg v. Hayes,* 408 U.S. 665 (1972) ......... *passim*

*Bursey v. United States,* 466 F.2d 1059 (9th Cir. 1972) .................................................. 11

*Cusumano v. Microsoft Corp.,* 162 F.3d 708 (1st Cir. 1998) ............................................. 15

*Dow Chem. Co. v. Allen,* 672 F.2d 1262 (7th Cir. 1982) ................................................ 20, 21, 22

*Edwards v. City of Goldsboro,* 178 F.3d 231 (4th Cir. 1999) ........................................... 22

*First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765 (1978) ............................................ 14

*Gilbert v. Allied Chem. Corp.,* 411 F. Supp. 505 (E.D. Va. 1976) ..................................... 11

*Grosjean v. American Press Co.,* 297 U.S. 233 (1936) ................................................... 13

*Healy v. James,* 408 U.S. 169 (1972) .............. 19

*Hillis v. Stephen F. Austin State Univ.,* 665 F.2d 547 (5th Cir. 1982) ................................... 23

*In re Grand Jury Proceedings (Scarce),* 5 F.3d 397 (9th Cir. 1993) .................................. 12

*In re Petroleum Prods. Antitrust Litig.,* 680 F.2d 5 (2d Cir.), *cert. denied,* 103 S.Ct. 215 (1982) ... 11

**\*iii** *Jaffee v. Redmond,* 518 U.S. 1 (1996) ........ 13

*Keyishian v. Bd. of Regents of Univ. of State of NY,* 385 U.S. 589 (1967) ............................ 9, 18, 19, 21, 23

*Kirkland v. Northside Ind. Sch. Dist.,* 890 F.2d 794 (5th Cir. 1989) ................................... 23

*NAACP v. Button,* 371 U.S. 415 (1972) ............ 11

*New York Times Co. v. Gonzales,* 459 F.3d 160 (2d Cir. 2006) ....................................... 12, 13, 17

*New York Times Co. v. Sullivan,* 376 U.S. 254 (1964) ................................................. 14

*Puckett v. United States,* 556 U.S. 129 (2009) ... 17

*Regents of the Univ. of Mich. v. Ewing,* 474 U.S. 214 (1985) .......................................... 19

*Riley v. City of Chester,* 612 F.2d 708 (3d Cir. 1979) ................................................. 11

*Santobello v. New York,* 404 U.S. 257 (1971) .... 17

*Shoen v. Shoen,* 5 F.3d 1289 (9th Cir. 1993) ...... 15

*Silkwood v. Kerr-McGee Corp.,* 563 F.2d 433 (10th Cir. 1977) ...................................... 11

*Sweezy v. New Hampshire,* 354 U.S. 234 (1957) ................................................. 19, 11

*Time, Inc. v. Hill,* 385 U.S. 374 (1967) ............. 14

*United States v. Burke,* 700 F.2d 70 (2d Cir. 1983) ................................................. 12

*United States v. Criden,* 633 F.2d 346 (3d Cir. 1980) ................................................. 12

**\*iv** *Univ. of Pa. v. EEOC,* 493 U.S. 182 (1990) ................................................. 19, 20

*Urofsky v. Gilmore,* 216 F.3d 401 (4th Cir. 2000) (en banc) ..................................... 22

*Zerilli v. Smith,* 656 F.2d 705 (D.C. Cir. 1981) .. 11

Statutes

18 U.S.C. § 3512 .............................................. 6

Other Authorities

Robert T. Bower & Priscilla de Gasparis, *Ethics in Social Research: Protecting the Interests of* ... 16

*Human Subjects,* New York: Praeger Publishers (1978) ..............................................

Robert H. McLaughlin, *From the Field to the Courthouse: Should Social Science Research Be Privileged?,* 24 Law & Soc. Inquiry 927 (1999)    16

Paul G. Stiles, John Petrila, Research and Confidentiality: Legal Issues and Risk Management Strategies, 17 Psychol. Pub. Pol'y & L. 333 (2011) ..............................................    16

Ethical and Legal Strategies for Projecting Confidential Research Information, Can. J.L. & Soc'y, 39 (2000) ..............................................    14, 17

## *1  INTEREST OF *AMICI CURIAE*[1]

[1]   Counsel of record for all parties received timely notice of the intent of *amici curiae* to file this brief pursuant to Supreme Court Rule 37.2. All parties have consented to the filing of this brief and their consent letters are on file with the Clerk of the Court. Pursuant to Supreme Court Rule 37.6, counsel for *amici* certifies that this brief was not written in whole or in part by counsel for any party and that no person or entity other than counsel for *amici* has made a monetary contribution to the preparation and submission of the brief.

*Amici curiae* are fourteen scholars with expertise in social research. Each is signing the brief in his or her individual capacity.

This case involves the United States Justice Department's subpoena of research materials - specifically, taped interviews with former members of the Irish Republican Army (IRA) - pursuant to the United States' Mutual Legal Assistance Treaty (MLAT) with the United Kingdom. The subpoenaed materials were collected by Petitioners with the understanding that they would not be made publicly available until the death of the person interviewed absent the interviewee's written consent. The interviews are part of the Belfast Project, a study by scholars and journalists seeking to acquire a deeper understanding of the causes and consequences of the conflict that swept through Northern Ireland between 1969 and 1998. Petitioners and the people they interviewed participated in the Belfast Project because they wanted to contribute to social knowledge  *2  and to help limit the possibility of future violent conflict in Northern Ireland and elsewhere.

The importance of the case goes well beyond the specific goals of the Belfast Project. Any social science or oral history research is threatened by the potential subpoena of confidential materials, including sensitive or personal information that may or may not involve illegal activity. The threat of unlimited subpoena power undermines the ability of any researcher to promise confidentiality and thus to obtain honest and reliable answers to the most pressing issues of our time.

*Amici* believe that the court of appeals' failure to honor confidentiality in the context of social science research radically undermines the ability of researchers to engage with their subjects. This is especially so in the context of a divided society like Northern Ireland, where governmental authorities may have a stake in undermining or even preventing the findings of neutral and objective scholarly research that will inform the interpretation of contemporary and historical events. The court of appeals' decision thus jeopardizes the long-term ability of scholars to gain

information regarding profoundly sensitive and controversial subjects, including information that can help society avoid violent conflicts in the future. Further, the interests of individual researchers and their affiliated institutions may not be perfectly aligned. As this case demonstrates, scholars cannot simply rely on their institutions to protect them or their research. *Amici* urge this Court to grant review **\*3** so that scholars can make informed and responsible decisions and intelligently assess the risks and benefits of a particular academic approach.

The fifteen *amici* are listed on the attached List of Scholars.

## STATEMENT OF THE CASE

*Amici* summarize the facts relevant to this brief.

**1.** The Belfast Project was sponsored by Boston College to mark the end of three decades of violence in Northern Ireland. A range of research ideas was canvassed and the college accepted a proposal from Petitioner Ed Moloney, an author and journalist whose work focuses on violence and politics in Northern Ireland, and Lord Paul Bew, an historian of Northern Ireland. Pet. at 1, 5-6. The inspiration for the research was the multi-party Good Friday Agreement of 1998, a critical milestone in the peace process following many years of strife in Northern Ireland, known as the "Troubles," that lasted from 1969 until the late 1990s. Pet. at 6.

The Belfast Project aimed to record and preserve for academic study the firsthand accounts of the "Troubles" by members of the Provisional Irish Republican Army (IRA), Provisional Sinn Fein, the Ulster Volunteer Force, and other paramilitary and political groups. Pet. App. at 5a; Pet. at 6-7. By learning why ordinary people on both sides of the conflict **\*4** were moved to take up arms and, ultimately, to lay them down and engage in the peace process, the Belfast Project researchers hoped to produce a study that would inform the decisions of policymakers who wrestle with and try to resolve social conflict. Pet. at 7.

Boston College agreed to sponsor the Belfast Project, with Moloney serving as Project Director. Pet. at 6; Pet. App. at 5a. Petitioner Anthony McIntyre - an author, journalist, Ph.D., and former IRA member - was hired as Lead Project Researcher. Pet. at 1, 6.

Between 2001 and 2006, Belfast Project researchers recorded interviews with forty-one subjects, including twenty-six combatants on the republican side of the conflict, fourteen members of Protestant paramilitary groups, and one member of law enforcement. Pet. App. at 7a.

Interviewers and interviewees agreed not to disclose the existence or scope of the Belfast Project without the permission of Boston College. Pet. at 7; Pet. App. at 6a, 52a. Interviewees also signed

donation agreements restricting access to Belfast Project interview records during their lifetime without their express written approval. Pet. at 7; Pet. App. at 7a-8a.

**2.** Boston College considered the Belfast Project confidential, and worked with its leadership to implement numerous safeguards to preserve that confidentiality. Pet. App. at 84a.

To maintain interviewees' anonymity, Boston College and Moloney used a coding system. Pet. App. **\*5** at 6a. Only Moloney and the librarian of the John J. Burns Library of Rare Books and Special Collections at Boston College (the Burns Library) had access to the identification key. *Id.*

Although the interviews were originally going to be stored both in Boston and in Belfast, Northern Ireland, Project leadership determined that they could be safely stored only in the United States. Pet. App. at 6a. Boston College safeguarded Project materials in the "Treasure Room" of the Burns Library "with extremely limited access." Pet. App. at 5a.

**3.** These assurances of confidentiality were essential to obtain interviewees' participation in the Belfast Project. Pet. at 7-10.

The need for confidentiality was particularly acute for former IRA combatants. Pet. at 7-8; Pet. App. at 36a n.26. Due to well-founded fears of violent reprisals (Pet. at 8-9), former IRA members would never have agreed to tell their stories to Project researchers had they known these interviews could be disclosed during their lifetime. Pet. at 7-8; Pet. App. at 36a n.26. One interviewee admitted his former affiliation in the IRA for the first time during his interview with McIntyre; he did so only because of his personal trust in McIntyre. Pet. App. at 84a. In fact, McIntyre himself would not have agreed to participate in the Project had he understood that the interviews could be disclosed by "legal process." Pet. App. at 53a.

 **\*6** Boston College's librarian understood that, "[h]ad the assurances of confidentiality not been made, it is doubtful that any paramilitary would have participated in this oral history project. Their stories would have died with them, and an opportunity to document and preserve a critical part of the historical record would have been lost forever." Pet. App. at 36a, n.26.

**4.** In May and August of 2011, a commissioner appointed pursuant to 18 U.S.C. § 3512 and the MLAT between the United States and the United Kingdom subpoenaed Boston College in connection with a criminal investigation in the United Kingdom into the abduction and death of Jean McConville, an alleged British informant in Northern Ireland. Pet. App. at 8a-9a; Pet. at 11.

The May 2011 subpoena sought oral history recordings and other materials associated with Belfast Project interviewees Dolours Price and Brendan Hughes.[2] Pet. App. at 3a, 8a. Boston College turned over the Hughes materials because Hughes had died and therefore had no confidentiality

interests remaining under the terms of the donation agreement, but **\*7** moved to quash the subpoena of the Price materials. Pet. App. at 3a, 7a-8a.

2      In 2010, Northern Ireland news organizations reported that Price had disclosed in interviews with Boston academics her involvement in the murder and disappearance of IRA targets, including McConville. Pet. App. at 8a-9a; Pet. at 11. Around the same time, following Hughes's death, Moloney published a book and released a documentary based on Project interviews with Hughes and another former republican activist. Pet. App. at 8a & 8a n.3.

The August 2011 subpoena sought any information contained in Project materials relating to the disappearance or death of McConville. Pet. App. at 3a. Boston College moved to quash this subpoena as well. *Id.*

The district court, after reviewing *in camera* the subpoenaed materials, denied both of Boston College's motions to quash and ordered production. Pet. App. at 3a. Boston College did not appeal. Pet. at 12.

**5.** Petitioners unsuccessfully sought to intervene in the proceedings related to the motions to quash both sets of subpoenae. Pet. App. at 4a, 89a-90a. When the district court denied intervention, Petitioners filed an original civil complaint challenging the subpoenae, which was dismissed. Pet. App. at 4a.

Petitioners appealed the denial of their motions to intervene and dismissal of their original complaint to the United States Court of Appeals for the First Circuit. Pet. App. at 4a. The First Circuit affirmed the district court's denial of relief for the reasons discussed in the Petition. Pet. App. at 38a.

## SUMMARY OF ARGUMENT

Forty years ago, this Court issued its fractured decision in *Branzburg v. Hayes,* 408 U.S. 665 (1972). **\*8** While the concurring opinion of Justice Powell is frequently viewed as the "common denominator" of the plurality, the lower courts have taken differing approaches to Justice Powell's suggestion that courts apply a balancing approach to determine when a reporter can assert a privilege against providing testimony or evidence that would breach his or her promise of confidentiality to a third party.

While most courts apply balancing in the civil context, few have resolved whether to apply it in the criminal context or in the grand jury context. The Court of Appeals' opinion in this case - rejecting balancing and even the reporter's right to be heard before granting a subpoena that would reveal confidential information - creates an intercircuit split and is inconsistent with most courts' reading

of *Branzburg.* The Court of Appeals' opinion is also at odds with this Court's precedent honoring the freedom of the press and the academy.

The result in the case creates potentially crippling uncertainty for those who gather information from confidential sources, including academic researchers like *amici.* Such researchers need to be able to assure their sources that their confidentiality will be respected and their interests considered by a court of law before the court grants a subpoena and publicizes their private information or personal identity. Without such assurances, many persons will be unwilling to speak with researchers, limiting the scope of social science research and leaving irreparable lacunae in human knowledge. The public will **\*9** ultimately pay the price, because the sort of research at issue here is critical to studies that inform policymakers seeking to manage civil strife.

This case presents the Court with an opportunity to clarify the level of confidentiality that researchers can promise their sources, so that they can collaborate with full awareness of the risks they are taking when they participate in the academy's search for truth.

The Court also faces a related opportunity to provide guidance on the scope of the long-recognized, but ill-defined, constitutional right to academic freedom. For a half-century, this Court has recognized that academic freedom is "a special concern of the First Amendment," *Keyishian v. Bd. of Regents of Univ. of State of NY,* 385 U.S. 589, 603 (1967), but has yet to delineate the contours of the right to academic freedom. The result is an unstable legal landscape. The Court of Appeals in this case has limited the realm of academic freedom to pedagogical concerns, while the Seventh Circuit has extended the right to academic freedom to protect the confidentiality of academic research. A constitutional right to academic freedom means little if uncertainty over its scope chills scholars from exercising it freely.

*Amici* respectfully urge the Court to grant the petition and bring uniformity to the law governing the confidentiality of academic research.

## **\*10  REASONS THE WRIT SHOULD BE GRANTED**

**REVIEW IS NEEDED TO CLARIFY THE SCOPE OF THE LAW PROTECTING ACADEMIC RESEARCHERS FROM DISCLOSURE OF CONFIDENTIAL MATERIALS, INCLUDING THE IDENTITY OF RESEARCH PARTICIPANTS.**

**A. Contrary to the Court of Appeals' holding, the First Amendment provides journalists a qualified right to maintain the confidentiality of their sources, even in grand jury proceedings.**

As discussed by Petitioners (Pet. 21-22, 28-31) and other *amici*, this Court's opinion in *Branzburg v. Hayes,* 408 U.S. 665 (1972), resulted in confusion among federal Circuit Courts of Appeals regarding the existence and scope of a "reporter's privilege of constitutional or common law dimensions" in civil and criminal cases. (Pet. 33a n.23.)

Justice White, speaking for the plurality, stated that "there is no First Amendment privilege to refuse to answer the relevant and material questions asked during a good-faith grand jury investigation," and "no privilege to refuse to appear before such a grand jury until the Government demonstrates some 'compelling need' for a newsman's testimony." *Branzburg,* 408 U.S. at 708.

Justice Stewart, speaking for the four dissenting Justices, observed that the plurality's position could compromise not only news gathering but the administration of justice: "The sad paradox of the Court's **\*11** position is that when a grand jury may exercise an unbridled subpoena power, and sources involved in sensitive matters become fearful of disclosing information, the newsman will not only cease to be a useful grand jury witness; he will cease to investigate and publish information about issues of public import." *Branzburg,* 408 U.S. at 746 (Stewart, J., dissenting) (citing *NAACP v. Button,* 371 U.S. 415, 433 (1972)).

Justice Powell, whose vote was necessary to the 5-4 decision, wrote separately to emphasize "the limited nature" of the Court's holding, and to make clear that, even in the grand jury context, prosecutors are not "free to 'annex' the news media as an 'investigative arm of government.' " *Branzburg,* 408 U.S. at 709 (Powell, J., concurring). Accordingly, Justice Powell stressed, each claim of privilege "should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct." *Id.* at 710. [3]

---

[3]    Justice Powell's concurrence may be viewed as the "minimum common denominator of all the views expressed," *Gilbert v. Allied Chem. Corp.,* 411 F. Supp. 505, 510 (E.D. Va. 1976), and is the primary authority used in subsequent reporter's privilege cases. *E.g., In re Petroleum Prods. Antitrust Litig.,* 680 F.2d 5, 8 (2d Cir.), *cert. denied,* 103 S.Ct. 215 (1982); *Zerilli v. Smith,* 656 F.2d 705, 711 (D.C. Cir. 1981); *Riley v. City of Chester,* 612 F.2d 708, 714 (3d Cir. 1979); *Silkwood v. Kerr-McGee Corp.,* 563 F.2d 433, 437 (10th Cir. 1977); *Bursey v. United States,* 466 F.2d 1059, 1091 n.2 (9th Cir. 1972).

**\*12** The interest balancing described by Justice Powell in *Branzburg* has been construed by virtually every federal appeals court that has considered the question as mandating recognition of a qualified reporter's privilege in civil cases. Several courts have also extended it to the criminal context. *E.g., United States v. Criden,* 633 F.2d 346, 356 (3d Cir. 1980) (recognizing the privilege in a criminal case, and emphasizing its importance: "the communications media not only serve as the vehicle that widely disperses information but also constitute an important instrument of democracy. \*\*\* Without the protection of the source, the cutting edge of this valuable societal instrument would be severely dulled and public participation in decision-making severely restricted."); *United States v. Burke,* 700 F.2d 70, 77 (2d Cir. 1983) ("We see no legally-

principled reason for drawing a distinction between civil and criminal cases. \*\*\* Indeed, the important social interests in the free flow of information that are protected by the reporter's qualified privilege are particularly compelling in criminal cases.").

In the grand jury and similar contexts (like the one presented here), however, the Circuits are split. *See New York Times Co. v. Gonzales,* 459 F.3d 160, 167-168 (2d Cir. 2006) (affirming reporters' right to bring a declaratory judgment action raising First Amendment and common law challenges to a grand jury subpoena); *cf. In re Grand Jury Proceedings (Scarce),* 5 F.3d 397, 401-402 (9th Cir. 1993) (holding there is no reporter's privilege in the grand jury context).

 **\*13** The First Circuit's opinion in this case, rejecting the existence of a reporter's privilege and eschewing the need for balancing altogether (Pet. App. 32a-35a), only deepens the split, and compels review by this Court. [4]

[4] This Court need not rest its analysis of privilege entirely on First Amendment jurisprudence. *Branzburg* was decided three years before Rule 501 of the Federal Rules of Evidence first "authorize[d] federal courts to define new privileges by interpreting 'common law principles … in the light of reason and experience.' " *Jaffee v. Redmond,* 518 U.S. 1, 8 (1996) (recognizing common law privilege protecting communications between psychotherapists and their patients) (citation omitted); *see also Gonzales,* 459 F.3d at 181 (Sack, J., dissenting) ("A qualified journalists' privilege seems to me easily - even obviously - to meet each of [the *Jaffee*] qualifications. The protection exists. It is palpable; it is ubiquitous; it is widely relied upon; it is an integral part of the way in which the American public is kept informed and therefore of the American democratic process.").

## B. Preservation of confidentiality is at least as important to social science researchers as it is to newspaper journalists because it is essential to their academic enterprise.

This Court has long recognized that a "reporter's constitutional right to a confidential relationship with his source stems from the broad societal interest in a full and free flow of information to the public. It is this basic concern that underlies the Constitution's protection of a free press [.]" *Branzburg,* 408 U.S. at 725-726 (Stewart, J., dissenting) (citing *Grosjean v. American Press Co.,* 297 U.S. 233, 250 (1936) and **\*14** *New York Times Co. v. Sullivan,* 376 U.S. 254, 269 (1964)). The "guarantee is 'not for the benefit of the press so much as for the benefit of all of us.' " *Id.* at 726 (quoting *Time, Inc. v. Hill,* 385 U.S. 374, 389 (1967)) (footnotes omitted). [5]

[5] Justice Stewart opined that, " 'in the case of the reporter-informer relationship, society's interest is not in the welfare of the informant per se, but rather in creating conditions in which information possessed by news sources can reach public attention.' " *Branzburg,* 408 U.S. at 726 n.2 (Stewart, J., dissenting (quoting Note, 80 Yale L.J. 317, 343 (1970)). *But cf. Ethical and Legal Strategies for Projecting Confidential Research Information,* Can. J.L. & Soc'y, 39, 41-42 (2000) (stressing "the ethical obligation \*\*\* to ensure that *research participants cannot be identified* on the basis of the information presented and to prevent information being linked to them[.]") (emphasis added).

This Court has likewise recognized that society's interest in a full and free flow of information extends beyond the sphere of news reporting to other types of information-gatherers, such as

academic scholars. *See First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 782 (1978) (the press "does not have a monopoly on either the first amendment or the ability to enlighten").

Although Petitioners here are journalists by trade, they conducted interviews with persons involved in the Irish Troubles in the context of an academic study sponsored by a university. The express goal of the Belfast Project - to learn why ordinary people on both sides of the conflict took up arms and why, ultimately, they were willing to lay **\*15** down arms and engage in the peace process, Pet. at 7 - is a goal characteristic of social science. Because the line between journalism and academic study is blurred in cases like this one, this Court should bear in mind the interests of reporters and scholars alike in considering the scope of the so-called "reporter's" privilege.

The First Circuit itself "favor[s] \*\*\* a similar level of protection for journalists and academic researchers" when it comes to preserving the confidentiality of their sources. *Cusumano v. Microsoft Corp.,* 162 F.3d 708, 714 (1st Cir. 1998).

> Journalists are the personification of a free press, and to withhold such protection would invite a "chilling effect on speech," [citation] and thus destabilize the First Amendment. \*\*\* [S]cholars too are information gatherers and disseminators. If their research materials were freely subject to subpoena, their sources likely would refuse to confide in them. \*\*\* Just as a journalist, stripped of sources, would write fewer, less incisive articles, an academician, stripped of sources, would be able to provide fewer, less cogent analyses.

*Id. See also Shoen v. Shoen,* 5 F.3d 1289, 1293 (9th Cir. 1993) (authors of investigative book entitled to same protection as journalists because such authors "have historically played a vital role in bringing to light 'newsworthy' facts on topical and controversial matters of great public importance").

**\*16** Social science scholars echo this reasoning. As several have observed,

> "it is the commonly held assumption in the [social science] profession, just as it is in medicine, law, and journalism, that people will tell a truer tale and act with less inhibition if they believe what they say or do will be held in the strictest confidence. This scientific rationale, combined with the ethical principle that one respects the privacy of research subjects[] has created uniform agreement among social scientists that confidentiality should be preserved by every possible means to protect the interests of both social science and the subjects of its research."

Paul G. Stiles, John Petrila, Research and Confidentiality: Legal Issues and Risk Management Strategies, 17 Psychol. Pub. Pol'y & L. 333, 337 (2011) (quoting Robert T. Bower & Priscilla

de Gasparis, *Ethics in Social Research: Protecting the Interests of Human Subjects,* New York: Praeger Publishers, 1978, 23); *see also* Robert H. McLaughlin, <u>*From the Field to the Courthouse: Should Social Science Research Be Privileged?,* 24 Law & Soc. Inquiry 927, 934-935 (1999)</u> (stating that recognition of academic privilege is necessary to "support a researcher's promises of confidentiality to informants," as an ethical matter and because it is clear that "[t]he prospect of having to refuse to respond to a subpoena **\*17** or to testify \*\*\* chills the depth of researchers' inquiries."). [6]

---

[6]  This Court similarly recognizes the importance of establishing trust between defendants and prosecutors in the plea bargaining context. <u>*Puckett v. United States,* 556 U.S. 129, 141 (2009)</u> (the "policy interest in establishing the trust between defendants and prosecutors \*\*\* is necessary to sustain plea bargaining [and is] an 'essential' and 'highly desirable' part of the criminal process.") (quoting <u>*Santobello v. New York,* 404 U.S. 257, 261-262 (1971)</u>).

Social scientists gather data, including the personal accounts of individuals who witnessed or participated in social or political events, not to relate events as they occur, but to provide a thorough, accurate, and meaningful analysis of those events after their studies are complete. An untimely subpoena can thus "disrupt[] the normal flow of research and publication," and "leav[e] the researcher vulnerable to potentially career-damaging critique." *Ethical and Legal Strategies for Projecting Confidential Research Information,* Can. J.L. & Soc'y at 62-63.

A subpoena can also compromise the privacy and even the safety of persons who agree to participate in studies like the Belfast Project. Often the most "[i]ndispensable information comes in confidence from \*\*\* informers operating at the edge of the law who are in danger of reprisal from criminal associates, from people afraid of the law and of government[.]" <u>*Gonzales,* 459 F.3d at 180</u> (Sacks, J., dissenting) (internal quotation and citation omitted). Cutting off **\*18** the sources of inside information that are essential to understanding decision-making processes and the interpersonal dynamics that inform decisions will impoverish social science research. This will, in turn, deprive the public of studies that are as complete, accurate, and reliable as possible; *i.e.*, studies that can most usefully be applied - by lawmakers, among others - to develop strategies for improving society.

Researchers need assurance that the courts will, at the very least, balance the need for confidentiality in social scientific studies with the needs of law enforcement. This Court should take the opportunity presented by this case to consider more fully the need to protect academic researchers by according them, as well as journalists, a well-defined privilege under the First Amendment or common law.

**C. This Court should grant the writ to resolve lower court confusion over the scope of the constitutional right to academic freedom.**

This Court has recognized that "[o]ur Nation is deeply committed to safeguarding academic freedom, which is of transcendental value to all of us." *Keyishian v. Bd. of Regents of Univ. of State of NY,* 385 U.S. 589, 603 (1967). Indeed, this Court has cautioned it would " 'imperil the future of our Nation' " " 'to impose any strait jacket upon the intellectual leaders in our colleges and universities' ":

> "No field of education is so thoroughly comprehended by man that new discoveries cannot **\*19** yet be made. Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes. Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die."

*Id.* (quoting *Sweezy v. New Hampshire,* 354 U.S. 234, 250 (1957) (Warren, C.J., plurality op.)). *See also, e.g., Healy v. James,* 408 U.S. 169, 180-181 (1972) (reaffirming "this Nation's dedication to safeguarding academic freedom"); *Regents of the Univ. of Mich. v. Ewing,* 474 U.S. 214, 226 (1985) ("academic freedom [is] 'a special concern of the First Amendment' ") (quoting *Keyishian,* 385 U.S. at 603); *Univ. of Pa. v. EEOC,* 493 U.S. 182, 195-197 (1990); *Bd. of Regents of Univ. of Wisc. Sys. v. Southworth,* 529 U.S. 217, 237 n.3 (2000) ("We have long recognized the constitutional importance of academic freedom") (Souter, J., concurring).

In refusing to quash the August 2011 subpoena, the Court of Appeals dismissed the possibility that Petitioners could invoke the constitutional right to academic freedom, opining in a footnote that this right protects only against "government attempts to influence the content of academic speech and direct efforts by government to determine who teaches." Pet. App. 30a n.20.

The Court of Appeals cited *Univ. of Pa.,* 493 U.S. at 197-198, as support for its view that academic **\*20** freedom is limited to teaching and does not extend to research. Pet. App. 30a n.20. But *Univ. of Pa.* fails to support this view. In affirming the enforcement of an EEOC subpoena seeking peer review materials used in a university's tenure decisions, this Court expressly declined "to define *** the precise contours" of the right to academic freedom, limiting its analysis to the facts before it. 493 U.S. at 198. In rejecting the university's argument that peer review materials should be kept confidential, this Court observed that its analysis was informed by the university's failure to "allege that the Commission's subpoenas are intended to or will in fact direct the content of university discourse toward or away from particular subjects or points of view." *Id.*

Petitioners, by contrast, allege just that. Specifically, they argue that allowing the government unlimited subpoena power will effectively "direct the content of university discourse away from" historical accountings of violent conflicts - such as the centuries-long sectarian "Troubles" in Ireland, or similar strife in the Balkans, Africa, or the Middle East - by chilling the participation

of those individuals whose fear of reprisal would prevent them from contributing absent credible guarantees of confidentiality.

The Court of Appeals' ruling here conflicts with the views expressed by the Seventh Circuit in _Dow Chem. Co. v. Allen,_ 672 F.2d 1262 (7th Cir. 1982), which correctly reviewed this Court's precedents to hold that "whatever constitutional protection is afforded by the First Amendment extends as readily **\*21** to the scholar in the laboratory as to the teacher in the classroom." _Id._ at 1275. The _Dow_ court affirmed the quashing of an administrative subpoena seeking the work product of university researchers, concluding that "what precedent there is at the Supreme Court level suggests that to prevail over academic freedom the interests of government must be strong and the extent of intrusion carefully limited." _Id._ (citing _Sweezy,_ 354 U.S. at 251, and _Keyishian,_ 385 U.S. at 604-605). Otherwise, enforcing a subpoena that seeks disclosure of confidential research materials would "threaten substantial intrusion into the enterprise of university research." _Id._ at 1276.

This intrusion, in turn, would be "capable of chilling the exercise of academic freedom" by the researchers in "several" ways, _Dow,_ 672 F.2d at 1276 - ways that apply just as much to this case as they did in _Dow._ For example, violating the confidentiality of research could "unnerv[e]" and "discourag[e]" researchers like those involved in the Project by allowing "the fruits of their labors" to be "appropriated by" and "scrutinized by a not-unbiased third party whose interests [are] arguably antithetical to theirs" - government officials who have no interest in protecting the welfare of participants. _Id._

Disclosure would thus " 'inevitably tend[] to check the ardor and fearlessness of scholars, qualities at once so fragile and so indispensable for fruitful academic labor.' " _Dow,_ 672 F.2d at 1276 (quoting _Sweezy,_ 354 U.S. at 262 (Frankfurter, J., concurring)). "To these factors must be added the knowledge of the **\*22** researchers that even inadvertent disclosure of the subpoenaed data could jeopardize both the studies and their careers," if that disclosure prevents reluctant witnesses from coming forward, for fear of reprisal, and providing their testimonies as to any number of emotionally raw episodes in history. _Id._

As the law stands now, researchers in the First Circuit - such as those at Boston College, Harvard or Brown University - cannot invoke their right to academic freedom under any circumstances, while researchers in the Seventh Circuit - such as those at Notre Dame University, the University of Chicago, and Marquette - have judicial assurance that their "interest in academic freedom may properly figure into the legal calculation of whether forced disclosure would be reasonable" when confronted with a subpoena. _Dow,_ 672 F.2d at 1276-1277.

The Court's intervention is needed to resolve this conflict and, more generally, to provide guidance as to the scope of a constitutional right that lower courts have found difficult to define and

enforce. *See, e.g., Urofsky v. Gilmore,* 216 F.3d 401, 410 (4th Cir. 2000) (en banc) ("Academic freedom is a term that is often used, but little explained, by federal courts … decisions invoking academic freedom are lacking in consistency") (internal quotations omitted); *Edwards v. City of Goldsboro,* 178 F.3d 231, 248 n.11 (4th Cir. 1999) ("Although the Supreme Court declared over thirty years ago that academic freedom is a 'special concern of the First Amendment,' the caselaw to follow on the subject has left us in murky waters") **\*23** (quoting *Keyishian,* 385 U.S. at 603); *Hillis v. Stephen F. Austin State Univ.,* 665 F.2d 547, 553 (5th Cir. 1982) ("Academic freedom is an amorphous field about which \*\*\* little [has been] determined in explicit, concrete judicial opinions. \*\*\* While academic freedom is well recognized, its perimeters are ill-defined and the case law defining it is inconsistent"); *accord Kirkland v. Northside Ind. Sch. Dist.,* 890 F.2d 794, 800 n.16 (5th Cir. 1989).

*Amici* respectfully request that the Court take this opportunity to provide that guidance.

## CONCLUSION

For the foregoing reasons and the reasons stated in the petition for certiorari, this Court should grant the petition.

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.